Filed 1/17/14  P. v. Bracken CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>WILLIAM ARTHUR BRACKEN,<br><br>  Defendant and Appellant. | C069541<br><br>(Super. Ct. No. MCYKCRBF101415) |

Over a period of many years defendant William Arthur Bracken molested three young boys, the children and grandchildren of friends who trusted him.  An information charged defendant with committing a lewd and lascivious act on John Doe I, a child under the age of 14 years; exhibiting harmful matter to a minor, John Doe II; committing a lewd and lascivious act on John Doe III, a child under the age of 14 years; two counts of sodomy on John Doe III; exhibiting harmful matter to John Doe III; and giving marijuana to a minor.  (Pen. Code, §§ 288, subd. (a), 288.2, subd. (a), 286, subd. (c)(1), 286, subd. (b)(1); Health & Saf. Code, § 11361, subd. (b); all further statutory references

are to the Penal Code unless otherwise designated.) A jury convicted defendant on all counts. Sentenced to 30 years to life plus seven years in state prison, defendant appeals, arguing evidentiary error, instructional error, insufficiency of the evidence, and the court erred in requiring him to pay attorney fees and defense investigation fees. We shall vacate the order requiring reimbursement of defense fees and remand for further findings. In all other respects we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant preyed on the children and grandchildren of friends. He molested and sodomized John Doe III when he was between 11 and 17 years old; he repeatedly gave him marijuana and showed him pornography. When John Doe II was nine years old, defendant showed him pornography and asked him if he masturbated. When John Doe I was seven years of age, defendant showed him pornography and molested him.

An information alleged seven counts based on defendant's actions: count 1, committing a lewd and lascivious act on John Doe I, a child under the age of 14 years; count 2, exhibiting harmful matter to a minor, John Doe II; count 3, committing a lewd and lascivious act on John Doe III, a child under the age of 14 years; count 4, sodomy on John Doe III, a child under the age of 14 years and more than 10 years younger than defendant, on or about June 2003 through August 2005; count 5, exhibiting harmful matter to a minor, John Doe III; count 6, sodomy on John Doe III, a child under the age of 18 years, on or about December 6, 2009; and count 7, giving marijuana to a minor over the age of 14 years. The information also alleged that as to counts 1 and 3, defendant committed the offenses against more than one victim within the meaning of sections 667.61, subdivision (b) and 1203.066, subdivision (a)(7). Defendant entered pleas of not guilty to all counts and denied the enhancement allegations. A jury trial followed and the following evidence was introduced at trial.

**Crimes Against John Doe I and John Doe II**

John Doe I and his half brother John Doe II lived with their father, T.W., whose parents were longtime friends of defendant. Defendant lived in T.W.'s neighborhood when T.W. was a child.

John Doe I was born in 2003 and John Doe II was born in 1995. John Doe I's stepmother D.W. and his sisters also lived with them. M.M. is John Doe I's mother and is married to J.M.

When John Doe II was nine years old, he stayed overnight at defendant's house. Defendant offered him alcohol and marijuana but told him not to tell anyone. John Doe II declined the alcohol but smoked some marijuana.

That evening, while John Doe II sat on defendant's bed with him, defendant turned on the television and showed John Doe II a pornographic video. Defendant warned him not to tell his mother. Defendant asked him if he thought the "girls were hot" and John Doe II said they were. When defendant asked him if he masturbated, he answered, "Yeah, but I'm not going to." John Doe II then left the bedroom.

John Doe II told his sister S.W. about the incident. He began to cry and asked her not to tell their parents. John Doe II did not tell anyone else because he did not want to get defendant in trouble. He thought of defendant as an uncle and wanted to protect him even though he knew what defendant had done was wrong.

In the summer of 2010 M.M. and J.M. lived on defendant's property. M.M. and J.M. lived in a trailer without electricity or water. According to D.W., M.M. and J.M. "had some issues with drinking [alcohol] at the time." John Doe I and his two sisters sometimes stayed with M.M., and John Doe I would visit defendant.

On the July 4, 2010, weekend, M.M. and J.M. planned a camping trip at a lake with John Doe I, his sisters, and defendant. On July 2, 2010, defendant called D.W. and asked for T.W. Defendant said John Doe I wanted to talk to D.W. John Doe I asked if he

3

could ride in the motor home with the other kids. D.W. agreed because she believed, mistakenly, that M.M. and J.M. were going along.

After they reached the lake, John Doe I and defendant were alone in the motor home. Defendant showed him pictures of naked bodies on his cell phone. Although the boy could not remember what the photos were of, he had never seen those kinds of photos before. Defendant then showed him a pornographic movie featuring a little rhino.

After it got dark, John Doe I climbed into the upper bunk and defendant offered him $20 to masturbate. John Doe I did not know what the term meant and defendant explained it by touching his own penis. Defendant then masturbated John Doe I, placing one hand on the boy's penis and the other on his own. Defendant rubbed John Doe I's stomach with lubricant and began rubbing John Doe I's penis. Defendant spent the night in bed with John Doe I.

The next day defendant gave John Doe I $20. The boy used the money to buy things at the campground store.

The day after John Doe I and defendant left for the lake, M.M. told D.W. that the pair had gone camping alone. Although defendant had promised to pay for the camping trip because M.M. and J.M. did not have any money, at the last minute defendant said he could not afford to take everyone camping.

Defendant had lied to M.M., telling her D.W. had given John Doe I permission to camp alone with him. When D.W. learned John Doe I was alone with defendant, she became upset and began trying to call defendant to tell him to bring her stepson home.

When D.W. told John Doe II where John Doe I was, John Doe II became upset. He was emotional and angry, telling D.W., " 'You need to do something, mom.' " When D.W. asked why, he told her about defendant's showing him pornography.

D.W. continued to call defendant's cell phone, and the next morning John Doe I answered it. D.W. asked to speak with defendant, but John Doe I said he was not there. She told him to have defendant call her right away. When defendant returned her call,

4

D.W. told him to bring John Doe I home. Defendant said John Doe I wanted to stay another night, but D.W. told him to bring the boy home immediately.

After he returned, John Doe I spent the night in John Doe II's bedroom. John Doe I asked John Doe II, "Have you ever meditated?" and John Doe II asked what he meant. John Doe I said, "Well, it's kind of gross, but [defendant] said that you do it." John Doe II asked, "Do you mean masturbate?" and John Doe I replied, "Yeah, masturbate. That's what I meant." John Doe II asked what defendant had told him and John Doe I replied: "Well [defendant] told me that if I masturbated, he'd give me 20 bucks." John Doe II told his parents.

When D.W. spoke with John Doe I alone, he told her he was alone with defendant in the camper the first night. He said defendant showed him naked people on a phone. Defendant asked him if he masturbated. At first, defendant was on one side of the motor home and John Doe I was on a different bed, masturbating with defendant's encouragement. Defendant then disrobed, got into bed with John Doe I, and rubbed something sticky from a bottle onto the boy's penis.

D.W. and T.W. did not report the incident for several weeks. Meanwhile, D.W. attempted to dissuade T.W. from killing defendant. T.W. did not want to report the molestation, because if he was able to kill defendant he would get in trouble.

In October 2010 D.W. told a district attorney's investigator that defendant's cell phone might contain pornographic images. A few days later the investigator interviewed John Doe I, who told him that while they were camping defendant showed him images on his cell phone. The pictures were of " 'naked chicks,' " a "girl's private which was talking," and "a guy with a huge nut sack."

The majority of the photos on defendant's phone were of bestiality. One was a photo of a man with large testicles who had his penis in a cow's mouth. Other photos were of naked women. Ten of the photographs were admitted into evidence. The phone also contained a video of a talking vagina.

5

**Crimes Against John Doe III**

When John Doe III was 10 years old he met defendant. Defendant was a friend of John Doe III's grandparents and lived next door to them. Over the years, defendant entertained 40 to 50 children at his house. At the time of trial, John Doe III was 18 years old.

While visiting his grandparents, John Doe III would spend time with defendant, playing video games and watching movies. Defendant took him to Disneyland and to monster truck shows. During this period, Steven M. and Joshua B. lived with defendant, and defendant told John Doe III he had been having sex with both of them.

When John Doe III was 11 years old, defendant paid him to help trim and water the marijuana growing at his house. Defendant gave him marijuana daily when he was 11 and again when he was 13 to 17 years old. Defendant gave him alcohol when he was 10 years old. Defendant twice gave him enough alcohol to make him intoxicated. He continued to give the boy alcohol until he moved away at age 17. On six occasions, defendant showed John Doe III pornography when they were alone.

When John Doe III was 11, defendant told him, " 'If you have sex with me, I'll pay you.' " Although he did not understand what defendant meant, he did what he was told. Defendant sodomized John Doe III and then paid him. Defendant told him not to tell anyone. John Doe III feared defendant but did not know what defendant had done was wrong.

At the age of 16, John Doe III lived with defendant for about a year. During this period defendant masturbated the teenager about five times and raped him seven or eight times. The last assault took place in December 2009, when John Doe III was 17 years old. Defendant offered to pay him, then sodomized him, and then paid him. John Doe III moved out the next day.

**Expert Testimony**

An expert, Catherine Golden of the district attorney's office, testified she had been trained in the psychology of victimization and had participated in hundreds of sexual abuse investigations. She testified based on her training and investigatory experience.

A pedophile is a person who prefers having sex with children. Grooming refers to the process by which a pedophile breaks down a child's inhibitions in order to molest the child without being discovered. Golden testified that a child molester is not generally attracted to all children, but often is attracted to a certain type of child.

Golden stated there are three different categories of molesters: seductive pedophiles, introverted pedophiles, and sadistic pedophiles. A seductive pedophile employs six stages of grooming a victim: targeting a child, gaining the child's trust, filling a need of the child, isolating the child, sexualizing the child, and then controlling the child. A seductive pedophile creates a relationship with the child victim, who comes to love the offender.

According to Golden, child molestation does not occur only in the absence of parental supervision or oversight. The seductive pedophile targets the entire family. Golden testified: "The family [of the victim] can be an intact family. The family could be a family with one parent. They find the needs of the family, and oftentimes they have to woo the parents to the point where if the child ever makes an accusation, the parents are already sold on the offender. It would be shocking. They wouldn't believe it." When a child sees that his or her parents like the pedophile, the child also begins to trust that person.

The pedophile can exert control over a child through giving gifts and money. He or she might also intimidate and threaten the victim with violence or humiliation. Pedophiles can convince their victims no one will believe them, isolating the victims.

Golden stated that the type of pornography used in child molestation is not necessarily child pornography. Pedophiles use pornography to stimulate their victims, so

7

it can be any kind of pornography. Showing the victim pornography further isolates the child and contributes to the sexualizing process.

Victims often fail to report molestations; some never reveal the abuse. Some children report abuse immediately. In Golden's experience, children's emotions about the abuse run the gamut, from anger and humiliation to regret for disclosing the abuse. Although Golden knew of victims who gave inaccurate information, she never encountered a victim who falsely reported molestation.

**Defendant's Uncharged Offenses**

The prosecution presented evidence of defendant's inappropriate acts with three other victims.

### Gary F.

Gary F., 27 years old at the time of trial, lived in Siskiyou County from the ages of four to seven. His father was defendant's friend, and Gary's sister "knew him very well." Defendant showed Gary pornography on several occasions.

Defendant molested Gary at least five times, beginning when he was four or five years old. The molestations continued until Gary moved away around the age of seven.

The first molestation took place at defendant's house. Gary spent the night, and he and defendant were lying together on defendant's bed. Defendant asked if he could touch Gary's stomach and legs. Defendant then began touching Gary's penis and rubbed himself.

The second molestation took place in defendant's vehicle. While parked, defendant asked if he could touch Gary, and Gary said yes. Defendant masturbated Gary while touching himself.

The third molestation occurred after a truck race when Gary stayed with defendant in a hotel. Defendant began touching Gary and asked if he could continue. Gary said yes. Defendant used a lubricant and ejaculated.

After Gary's parents told him he could not see defendant anymore, Gary and defendant went out in defendant's car. Defendant masturbated him. On several occasions defendant orally copulated Gary, but Gary could not remember when those molestations took place.

### Joseph P.

When Joseph P. was 13 years old he met defendant, who worked with Joseph's mother. Defendant was a friend of the family and Joseph spent time at defendant's house.

At the age of 14, Joseph passed out in defendant's camper after he and defendant had been drinking. When Joseph woke up, he found defendant orally copulating him. On another occasion when Joseph was 14, he drank with defendant in the back of defendant's car. Defendant then orally copulated Joseph.

### Josh T.

Josh T., who was 13 at the time of trial, lived near defendant and spent time at his house. He played video games with defendant and rode four-wheelers. Josh spent the night at defendant's house with Josh's older brother, Adam, who was 14 at the time. The boys spent the night upstairs; defendant slept downstairs.

One day when Josh and Adam were at defendant's house, they had trouble with the television. Defendant put the television on a particular channel and left the room. Josh testified that on the television, "people started having sex." He provided details of the pornography, which involved adult sex, and testified he and Adam tried to change the channel. When defendant returned, he said the movie was inappropriate and changed the channel to one showing cartoons.

## Defense Case

Defendant presented testimony by several witnesses who had known him during the period in question.

*Eric Longhofer*

Eric Longhofer, 31 at the time of trial, met defendant when he was nine and spent time with him between the ages of 11 and 13. Defendant never made any sexual advances toward him. Longhofer's stepfather worked for the sheriff's department, and if defendant had approached him sexually, Longhofer would have told his stepfather.

*RoseAnn Fogel*

RoseAnn Fogel met defendant in 1988 after moving into a trailer near defendant's parents' home. At that time Fogel's children were four, six, eight, and 10 years old. Defendant and Fogel dated and had a sexual relationship for a few months. She still considered defendant a friend. Fogel saw many other children spend time at defendant's home; however, she never saw defendant do anything that would concern her about his being sexually inappropriate around children.

*Joshua B.*

Joshua B., 25 at the time of trial, met defendant through a friend when Joshua was 11 or 12. Joshua's family lived across the street from defendant, and his father knew defendant. Joshua and his friends spent time at defendant's house, playing video games and riding dirt bikes. He stayed overnight at defendant's house twice a month.

Defendant had a variety of girlfriends. He never made any sexual advances toward Joshua or showed him pornography. Joshua never observed anything that made him concerned about defendant's sexual practices. According to Joshua, defendant was not a child molester.

On the weekend of July 4, 2010, Joshua was with a girlfriend at the same lake where defendant and John Doe I camped. Joshua had known John Doe I's parents for 15 to 20 years and had seen John Doe I previously at defendant's house. When Joshua arrived at the lake, defendant was setting up camp.

At defendant's request, Joshua gave John Doe I a ride from the lake to the boy's grandparents' house. John Doe I had not wanted to leave.

The day of defendant's arrest, his home was burglarized. Defendant asked Joshua to pick up all of his property at the jail. Joshua picked up the items, including a cell phone. Joshua gave the phone to a district attorney's investigator; he did not delete anything from the phone.

In August 2010 Joshua saw defendant with John Doe I's stepfather J.M. at defendant's house. They were talking about defendant's request that J.M. vacate their rental on defendant's property. J.M. was drunk and angry, and the discussion deteriorated into a shouting match. In the following weeks, Joshua saw J.M. driving down the road defendant lived on, screaming obscenities.

### Steven M.

Steven M. began spending time at defendant's house when he was eight, and when Steven's father passed away, defendant became a father figure to him. Steven spent the night at defendant's house about once a month. Defendant took Steven on trips to monster truck shows and the beach.

At the age of 15 or 16, Steven moved in with defendant. Defendant took him in because Steven's mother was involved with methamphetamine. Steven lived with defendant from 2002 until spring of 2009, when Steven turned 22. Steven testified these were the best years of his life.

Steven testified that during the years he lived with defendant, defendant was an alcoholic. He drank a 12-pack of beer every day, beginning at any time between noon and 2:00 p.m. Defendant would not drive after 2:00 p.m. "because of drinking and driving." Defendant also grew marijuana, and Steven cared for the plants when he was 19 to 21 years old. Steven smoked marijuana for a total of nine years; he obtained a medical recommendation when he was 18.

According to Steven, defendant did not act his age when Steven moved in with him but acted like a 15 to 16 year old. He liked video games and riding four wheelers.

11

Right before Steven moved out of defendant's house, he met John Doe III. John Doe III was the grandson of defendant's neighbor and spent time at defendant's house playing video games. John Doe III never appeared hesitant around defendant and never confided in Steven.

Steven testified defendant never approached him in a sexual way. He never watched pornography with defendant. Defendant showed him pictures on his cell phone, but they were not "pornography," just pictures of naked women. In Steven's opinion, defendant was not a child molester or a sexual deviant.

While Steven lived with him defendant did not have a girlfriend, but Steven was "pretty sure [defendant was] straight." Defendant lost his trust in women because he had been hurt.

Defendant had a water bed. Once when Steven was under the age of 15, defendant covered his water bed mattress with baby oil, and he and Steven jumped on it clad only in their underwear. Steven's mother expressed concern about the incident, but it was alleviated after she talked to defendant and Steven.

Steven moved out because the rent became too high. Defendant was charging him more than the entire amount of rent defendant paid. At the time of trial, defendant was paying Steven $200 per month so that when he was released defendant would have a place to stay.[1]

### Carl P.

Defendant is Carl P.'s uncle. At the time of trial Carl was 29 years old. When he was between the ages of three and seven, Carl and his family spent time at defendant's house, and Carl spent the night there every few months. Carl moved out of his family home at age 13 because his stepfather was an abusive alcoholic. After he moved out,

---

[1] Steven was convicted of selling drugs in 2011. He had sold $50 worth of marijuana.

Carl spent the night at defendant's house several nights a week. While he was a teenager, Carl drank alcohol at defendant's house and smoked marijuana defendant gave to him. Defendant's house was full of children, many of whom were related to him.

Carl had slept in the same bed with defendant when they went camping. There was never any sexual contact between them, nor did defendant ever do or say anything inappropriate. Carl never observeed anything that made him concerned about defendant's relationship with children. In Carl's opinion, defendant was not a sexual deviant. Carl had sent pornographic images to defendant.

Defendant also presented testimony by investigating detectives and John Doe I's mother and stepfather.

### *Deputy Gabe Garrison*

On August 31, 2010, Deputy Sheriff Gabe Garrison interviewed D.W., John Doe I's stepmother. D.W. said that on August 30, 2010, John Doe I told her defendant had paid him $20 to masturbate. She had been waiting for John Doe I to bring it up, but he did not so she broached the subject with him.

### *M.M.*

John Doe I's mother testified that she had known defendant for at least 19 years. She and her husband J.M. rented a house from defendant in the spring of 2010. M.M. trusted defendant, considered him a friend, and allowed John Doe I to spend time with him.

M.M. lived near defendant for 10 years, and she brought her children to his house and saw other children there. Defendant kept lots of toys at his house as well as video games and four-wheelers. M.M. testified that both she and defendant were alcoholics.

Both M.M. and J.M. had cell phones. John Doe I was not allowed to play with their phones because they had inappropriate pictures on them. Defendant sent some of the inappropriate pictures to M.M., including a video of a talking vagina that he sent during the summer of 2010.

13

According to M.M., she did not quarrel with defendant prior to the molestation allegations. The family decided to move after the molestation allegations were made. Within two weeks of learning of the allegations, M.M. and J.M. left the house they had rented from defendant. At the time of trial they were living in a trailer parked behind a friend's house.

In August 2010 D.W. told M.M. that John Doe I had made upsetting comments and that she would get back to M.M. about them. A month and a half later, D.W. told M.M. about the molestation allegations. M.M. did not report the allegations herself because D.W. told her that she and T.W. were "taking care of the matter." M.M. gave a statement after the police contacted her.

John Doe II told M.M. about watching pornography at defendant's house. He said it made him uncomfortable and he wanted to leave.

M.M.'s family had a tradition of camping at the lake every Fourth of July. In 2010 they could not pay the camping fee. Defendant offered to pay the fee, but they decided they did not have enough money for other expenses. M.M. told defendant that he needed to get permission from D.W. and T.W. to take John Doe I camping. Defendant told her he had received D.W.'s permission. That same day defendant and John Doe I left on the camping trip.

### Detective Bob Buker

Detective Bob Buker interviewed John Doe III on October 6, 2010. John Doe III told the detective that he and defendant had sex twice. The first time was possibly in 2006, when he was 11 years old.

Buker also interviewed M.M., who said she had not spoken to John Doe I about the molestation. John Doe I did not appear to be traumatized, but she believed he probably was "a little bit." M.M. told Buker that John Doe II had walked into defendant's room while defendant was watching pornography; it made him uncomfortable and he left the room.

14

### J.M.

J.M. testified that in June 2010 defendant sent a video of a talking vagina to M.M.'s cell phone.

**Rebuttal**

The prosecution presented testimony by several witnesses in rebuttal.

### J.M.

During rebuttal, J.M. reconsidered the date on which M.M. had received the talking vagina video. It was not until after July 31, 2010, that he and M.M. purchased a phone that could send and receive videos. Therefore, defendant could not have sent the video until after July 31.

J.M. and M.M. paid defendant $200 a month in rent during the summer of 2010. Prior to the molestation allegations, the couple were good friends with defendant, whom they trusted. On August 26, 2010, J.M. spoke with defendant about continuing to live on his property. Joshua B. was not there. Defendant said someone told him M.M. was spreading rumors about his being a child molester. The couple owed defendant $100 in rent. Defendant said they could no longer stay there because M.M. was falsely accusing him of molestation. Defendant called the landowner and said J.M. had stolen "stuff." Defendant told J.M. the landlord was coming to help evict him. J.M. denied yelling obscenities at defendant while driving. J.M. had a 2002 conviction for a crime of moral turpitude.

### Karen Simas

Karen Simas, a victim services advocate for the district attorney's office, observed John Doe I's testimony at trial. Simas noted that at a certain point in his testimony, John Doe I's answers slowed, and he lowered his head and took a long pause before answering one of counsel's questions. The court then called a break. During the break, John Doe I spoke with D.W., who had been present during his testimony. When the trial recommenced, D.W. did not return, but T.W. remained during John Doe I's testimony.

15

*Catherine Golden*

Golden interviewed Steven M. in August 2011. Steven told Golden that when he was 16 or 17, defendant showed him a box of pornographic magazines. The incident with the oiled water bed mattress took place when Steven was 12 years old. His mother was very upset about the incident and questioned Steven about whether defendant had touched him inappropriately. Steven told Golden defendant always slept in the nude.

**Verdict and Sentencing**

The jury convicted defendant on all charges and found true the multiple victims allegation. The court sentenced defendant to 30 years to life plus seven years in prison: count 1, 15 years to life; count 2, eight months (one-third the midterm), to be served consecutively to count 1; count 3, 15 years to life, to be served consecutively to count 1; count 4, eight years (the upper term), stayed pursuant to section 654; count 5, eight months (one-third the midterm), to be served consecutively to count 1; count 6, eight months (one-third the midterm), to be served consecutively to count 1; and count 7, five years (the upper term), to be served consecutively to count 1. In addition, the court ordered defendant to pay $37,000 in attorney fees, $10,000 in defense investigation fees, and victim restitution, fines, and fees as set forth in the record. Defendant filed a timely notice of appeal.

## DISCUSSION

**Admissibility of Images from Defendant's Cell Phone**

Defendant argues the trial court erred in admitting into evidence John Doe I's statement to detectives that defendant showed him pornography on his cell phone, and erred in admitting into evidence the images found on his cell phone. Specifically, defendant argues John Doe I's hearsay statements do not fall under Evidence Code section 1360, the evidence should have been excluded under Evidence Code section 352, and the inflammatory nature of the evidence violated defendant's federal right to a fair trial.

*Background*

At his initial interview with Detective Buker in September 2010, John Doe I made no mention of the pornography. A few days later D.W. contacted officers and said that, based on something John Doe I had said, she believed there were pornographic images on defendant's cell phone. A few weeks later, Buker again interviewed John Doe I, who said that during the camping trip defendant showed him pornography on his cell phone.

Defendant had the cell phone when he was arrested, but it was subsequently released to Joshua B. Two weeks later officers recovered the phone from Joshua.

Officers obtained a search warrant for defendant's cell phone. After local authorities were unsuccessful in retrieving images from the phone, an officer took the phone to the California Department of Justice. There, images coinciding with John Doe I's statements were found on the phone.

At trial, John Doe I testified that on the first night of camping, defendant showed him "nasty pictures" or pictures of "nasty stuff" on his cell phone. John Doe I identified defendant's cell phone. Although he could not remember exactly what the images were, he had never seen any such photos before. They were nasty pictures of naked people.

During his initial interview, John Doe I told officers that only he and defendant were at the campsite on the first night. The next morning a "girl" came with two children. They met one of defendant's friends at the campground. Defendant showed John Doe I a movie with "one guy with a weird hairdo" who "control[led]" a "fake little rhino," and "he went out the butthole of the rhino." The "guy" got into the rhino's "butthole," then "it got really hot, so he had to take off all his clothes and he got out."

Marc Perrin, an investigator with the district attorney's office, testified that John Doe I stated defendant showed him images on his cell phone during the camping trip. John Doe I told Perrin he saw "naked chicks" and "a girl's private which was talking. And a guy with a huge nut sack." Defendant showed him the images on the cell phone while they were in defendant's motor home. Perrin described the images taken from

17

defendant's phone that matched John Doe I's testimony: a man with "rather large" testicles who had his penis in what appeared to be a cow's mouth, naked women, and a video of a talking vagina.

The prosecution sought to admit the cell phone photos and video, arguing: "The relevance is that this was, first of all, a pattern that's been shown throughout this case with [Evidence Code section] 1108 victims and the other three -- or, the other two John Does who testified to this case, the pornography and pornographic images were shown. This is harmful material. And, in fact, it's . . . no coincidence that there are actually two charges of harmful matter charged against the defendant in this case. And this is not one of them. And, yet, it's the third John Doe, and harmful matter was shown to him.

"Furthermore, to have a child that young describe something this -- outside the experience of a young child corroborates very, very strongly the truth of what was being reported by him. And the fact that it was found on the phone is a remarkable piece of corroboration. It really couldn't be more relevant to his credibility."

The court reasoned: ". . . I'm considering maybe limiting how many photos . . . the jurors need to see . . . . I'm going to overrule the defense objection as to the foundation objection. And, I mean, it is relevant to not only corroborating or the credibility of John Doe I.

"It's true that . . . there's no charges that [defendant] showed [John Doe I] any harmful [matter] -- I mean, there's not a specific charge as to John Doe 1, but in the context of the allegations -- and I think it might possibly even . . . be relevant somewhat to the intent to arouse. That's something that's a very specific requirement to count 1."

The prosecution also sought to admit 12 photographs from defendant's phone. The parties agreed to remove two and the court admitted two over defendant's objection, for a total of 10 photos admitted.

*Discussion*

Defendant argues the evidence was not admissible under Evidence Code section 1360, since John Doe I's testimony did not describe an act of child abuse as required under the statute. Nor was there any evidence that defendant showed John Doe I the images "near or in conjunction with" the child abuse, defendant's lewd act.

The prosecution of child sexual abuse presents a unique set of problems: the frequent lack of physical evidence, the victim's limited verbal ability, intimidation of the victim by the courtroom setting. and the victim's reluctance to testify. To remedy these difficulties, the Legislature has passed evidentiary statutes that provide "considerable opportunity to introduce hearsay evidence in order to protect the interests of a child in an abusive situation." (*In re Cindy L.* (1997) 17 Cal.4th 15, 28-30; quotation at p. 30.)

Evidence Code section 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statement describing acts of child abuse or neglect, including statements describing sexual abuse. We review the court's admission of evidence under section 1360 for an abuse of discretion. (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.)

Evidence Code section 1360 provides: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child either:

"(A) Testifies at the proceedings.

19

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.

"(b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement.

"(c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code."

Defendant argues Investigator Perrin's testimony regarding John Doe I's statement about being shown the pornography was not admissible because "[e]xhibition of harmful matter to a minor ([Pen. Code,] § 288.2, subd. (a)) is not enumerated in either [Evidence Code] section 1360, subdivision (c) or [Penal Code] section 11165.1 as 'child abuse.' Therefore [John Doe I's] description of viewing images on the phone was not a description of 'child abuse.' Even if Evidence Code section 1360 were construed to cast a very wide net, expansively including events beyond its precise and straightforward language of 'describing child abuse,' there was no evidence *when* on the multi-day camping trip [John Doe I] viewed the images. There was certainly no evidence that it occurred near or in conjunction with the 'child abuse,' i.e., [defendant's] lewd act."

We disagree with defendant's assessment of the evidence. John Doe I told officers that the first night of the camping trip defendant showed him "nasty pictures" and pictures of "nasty stuff" on his cell phone. The same night, defendant molested him. As expert Golden testified, molesters often use different types of pornography to stimulate a child. Showing a child pornography can both isolate and sexualize the victim. John Doe I's statements about the pornography and the exhibits themselves are descriptive of

20

the atmosphere in which defendant's sexual abuse of John Doe I took place. Therefore, the evidence was admissible under Evidence Code section 1360.

Defendant also argues the evidence was inadmissible under Evidence Code section 352. According to defendant, the probative value of the images was minimal and cumulative, while the prejudicial impact was great.

Under Evidence Code section 352, we must strike a balance between the probative value of the evidence and the danger of prejudice. We consider the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relative to the main issue, and the necessity of the evidence to the prosecution's case. We also consider the reasons for excluding the evidence based on its prejudicial impact. The trial court's ruling under section 352 will not be disturbed absent an abuse of discretion. (*People v. Houston* (2005) 130 Cal.App.4th 279, 304.)

At trial, defendant argued the victims were not telling the truth. The images the court admitted corroborated John Doe I's version of events, making them probative on the issue of his veracity. As the Supreme Court noted in *People v. Memro* (1995) 11 Cal.4th 786, 865, in considering explicit images in an abuse case: "We find no abuse of discretion in admitting the magazines or the photographs. To be sure, some of this material showed young boys in sexually graphic poses. It would undoubtedly be disturbing to most people. But we cannot say that it was substantially more prejudicial than probative, for its value in establishing defendant's intent to violate section 288 was substantial. The court balanced the items' evidentiary worth against their potential to cause prejudice and determined that the former substantially outweighed the latter. Its decision was reasonable." Here, the testimony and photos were less inflammatory than the substance of the victims' testimony about defendant's molestations. The court did not abuse its discretion in finding the probative value of the evidence outweighed its prejudicial impact.

21

**Instructional Error**

Defendant faults the trial court for failing to give sua sponte the limiting instruction found in CALCRIM No. 1193. Such an instruction was necessary, defendant avers, because the prosecution presented evidence about common misconceptions regarding pedophiles and child molesters, but did not instruct the jury that it could not use that testimony to determine defendant's guilt.

*Background*

During trial, the prosecution, through expert Catherine Golden, sought to present evidence to rebut a series of misconceptions about child molestation. The misconceptions were (1) a child molester is attracted to all children and awaits only the opportunity, (2) child molestation is an act of violence, (3) child molestation involves only children with inadequate parental oversight, (4) child molestation is done only for the pleasure of the molester, (5) sexual material used in molestation is child pornography, and (6) a child will immediately and accurately report molestation. Defense counsel objected; the court overruled the objection. Golden testified as summarized *ante*, at pages 7 and 8.

Defendant contends that given Golden's testimony, the court should have instructed sua sponte with CALCRIM No. 1193, which states: "You have heard testimony from [expert] regarding child sexual abuse accommodation syndrome.

"[Expert's] testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her).

"You may consider this evidence only in deciding whether or not [names of alleged victims'] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The court did instruct the jury with a modified version of CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.

22

"Some of this evidence was admitted to show the circumstances of the reports of sexual abuse made by some of the witnesses. You may not use this evidence for the truth of the words used in the reports of sexual offenses, but only to establish the fact of, and the circumstances surrounding, the victim's disclosure of the offense(s) to others in your determination of whether the offense(s) occurred.

"The testimony of Gary [F.] and Joseph [P.], relating to allegations of sexual offenses by the defendant that are not charged in this case, may be considered for a limited purpose if you determine that they have been proven by a preponderance of the evidence. Further instructions on the burden of proof for this evidence, the elements of these alleged uncharged offenses, and the limited purpose for which this evidence may be used, are defined further in these instructions. You may consider this evidence only for the purpose(s) provided in those instructions."

### *Discussion*

Defendant concedes an expert may testify to child sexual abuse accommodation syndrome (accommodation syndrome) to dispel misconceptions about the actions of sexual abuse victims, but he argues such testimony is inadmissible to prove a molestation actually occurred. According to defendant, the court failed to instruct the jury on how it was permitted to use this evidence.

Generally, absent a request by the defendant, a trial court has no sua sponte duty to give a limiting instruction. (*People v. Smith* (2007) 40 Cal.4th 483, 516.) However, in *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*), the appellate court found the trial court had a sua sponte duty to instruct pursuant to CALCRIM No. 1193 because of the potential misuse of accommodation syndrome evidence and the resulting prejudice to the defendant. (*Housley*, at pp. 958-959.) The court reasoned special precautions must be taken to insure the jury does not accord an expert's opinion undue weight. A jury may readily accept the accommodation syndrome expert testimony because it is beyond the jury's expertise. (*Id*. at pp. 957-958.) According to the court, accommodation syndrome

23

evidence is unusually susceptible of being misunderstood and misapplied by a jury, "perhaps because the expert commonly is asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred." (*Id*. at p. 958.) Therefore, the jury could view the expert as corroborating the victim, unfairly buttressing the prosecution's case. The court also determined that it is pointless to instruct the jury on what weight it should give to such evidence when the jury has not been told the proper use of such testimony. (*Ibid*.)

However, the court in *Housley* found the error in failing to instruct sua sponte harmless. The court noted the expert witness "twice told the jury she had not met the victim and had no knowledge of the case. Her testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim." (*Housely*, *supra*, 6 Cal.App.4th at p. 959.) The court found it unlikely that the jury interpreted the expert's statements as supporting the victim's credibility. Therefore, it was not reasonably probable the defendant would have received a more favorable verdict if the limiting instruction had been given. (*Ibid*.)

Here, even if the court erred in not giving CALCRIM No. 1193, we find any such error harmless. Golden did not testify about defendant or any of the facts specific to this case. Her testimony was generic. The prosecution told the jury Golden's testimony covered possible misconceptions by the public about child molestation. During closing argument, the prosecution reiterated that Golden testified about misconceptions the general public may have. Defense counsel, during closing argument, also reminded the jury that Golden's testimony focused on the common misperceptions about child molestation.

The trial court instructed the jury that in considering expert testimony, it "must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. . . . You must decide

24

whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.) Golden's testimony, like the expert testimony in *Housley*, was couched in general terms, describing behavior common to many abuse victims, not the victims in this case. Given that the court instructed the jury that it could reject Golden's testimony, we find it not reasonably probable defendant would have received a more favorable verdict had the instruction been given.

**Sufficiency of the Evidence**

Defendant challenges the sufficiency of the evidence in support of his convictions in counts 2 and 5, showing harmful matter to minors with the intent to seduce. According to defendant, sufficient evidence did not reveal the material he showed John Doe II and John Doe III was harmful within the meaning of sections 288.2, subdivision (a) and 313, subdivision (a), or that he showed them the material with the intent to seduce.

### *Harmful Matter*

Section 288.2, subdivision (a) states: "Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense . . . ."

Section 313, subdivision (a) defines "harmful matter": " 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts

or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

The definition of harmful matter under section 313 essentially tracks the three-pronged test for obscenity set forth in *Miller v. California* (1973) 413 U.S. 15, 24 [37 L.Ed.2d 419] (*Miller*): (1) whether the average person, applying contemporary community standards, would find the work appeals to the prurient interest; (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined in state law; and (3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. (*People v. Hsu* (2000) 82 Cal.App.4th 976, 992.)

As one court has explained: "Thus, the modern *Miller* standard and the *current* definition of 'harmful matter' in section 313 are virtually identical, with the exceptions that under section 313 the relevant community standard by which the material is evaluated is 'statewide' and, in context, the work must lack serious literary, artistic, political, or scientific value *for minors.* In essence, then, to fall within the terms of section 288.2, subdivision (a), the material exhibited to the minor must be 'obscene' as defined by *Miller,* except that its socially redeeming values must be of a nature that can be appreciated by a minor. [Fn. omitted; citation.] If this test is not met, there is no violation of section 288.2, subdivision (a) even if the other elements of that statute are met." (*People v. Dyke* (2009) 172 Cal.App.4th 1377, 1383 (*Dyke*).)

Defendant argues "[a]s to both Counts 2 and 5, there was no tangible evidence at trial as to what either [John Doe II] or [John Doe III] saw. Each young man described very brief views of material on the television; it was unclear as to both episodes whether it was a channel or a video. Their descriptions provide the only evidence from which a determination could be made as to whether the matter viewed met the test for harmful matter. The evidence that the images met the test for harmful matter is insufficient." In support, defendant cites *Dyke*, *supra*, 172 Cal.App.4th 1377.

26

Under *Miller*, the determination of what is patently offensive under the community standard obscenity test is a question of fact.  (*Miller*, *supra*, 413 U.S. at p. 30.)  Therefore, we consider whether a rational trier of fact could have found the materials defendant showed his two victims to be patently offensive under contemporary statewide standards.  We evaluate the materials from the perspective of their impact on an average person, not a particularly susceptible person or a totally insensitive person.  (*Dyke*, *supra*, 172 Cal.App.4th at p. 1384.)

In *Dyke*, the sole evidence that the television program the minor victim viewed met the test for harmful matter was the victim's testimony.  There was no tangible evidence introduced of precisely what the victim saw.  Instead, the victim testified that while the defendant was flipping through television channels, "she recalls seeing a naked female dancing, and a man and woman, from the waist up, 'having sex.'  The camera angle was such that the lower portion of the couple could not be seen.  The upper bodies of the two people were unclothed, and the woman was 'on top.'  A.S. [victim] observed the female dancing for '[p]robably like eight minutes,' and the couple apparently having sex for 'maybe like 45 seconds.' " (*Dyke*, *supra*, 172 Cal.App.4th at p.1384.)

The court found that, given this testimony, it was impossible to conclude the television segments the victim observed did not contain " 'serious literary, artistic, political, or scientific value for minors.' " (*Dyke*, *supra*, 172 Cal.App.4th at p. 1386.)  The court observed:  "Was the dance by the unclothed female lurid, artistic, or even a cultural or tribal dance?  There is no way to know and no reasonable basis for inferring that it lacked such value.  As to the 45-second glimpse of the couple presumably having sexual intercourse, was the clip part of a tawdry adult film, a former Academy Award winner being shown on television that night, or even a brief scene from Shakespeare's Romeo and Juliet?  [Fn. omitted.]  Once again the record provides no basis for drawing a reasonable inference that either clip lacked 'serious literary, artistic, political, or scientific value for minors.'  Without that evidence, a reasonable jury would not be able to judge

27

the clips viewed by A.S. to be 'harmful matter,' as defined in section 313." (*Dyke*, at pp. 1386-1387.)

Here, defendant challenges the sufficiency of the evidence to support counts 2 and 5. In count 2, defendant was charged with showing harmful matter to John Doe II with the intent to seduce the minor, and in count 5, with showing harmful matter to John Doe III with the intent to seduce.

In count 2, John Doe II spent the night at defendant's home. Defendant offered him beer and marijuana, and turned on the television. John Doe II saw "two naked chicks" on a bed, kissing and touching. He saw their bodies, including their genitals. When defendant asked him if he thought the girls were "hot," he agreed one was. Defendant asked him if he masturbated. He said yes, "but I'm not going to," and left the room.

John Doe II testified pornography meant people doing "sexual things, naked, like in a bedroom setting or something, on recording or pictures." He explained the difference between an R-rated movie with nudity and a pornographic movie is that an R-rated movie is "not just sex. It like has a plot or something, like it tells a story, and a porno is just people having sex, naked, and like laying on a bed and, yeah, stuff like that." John Doe II had watched pornographic movies when he was seven or eight years old. He and his sister were on their own because their mother was drinking a lot.

In count 5, when John Doe III was around 12 or 13 years old, defendant showed him pornography. John Doe III testified he saw a naked man and woman having sex in a video. He could see their genitals. Defendant showed John Doe III pornography at least five times. When John Doe III was 11, defendant asked him to have sex with defendant for money. Defendant had "sex with [him] in [his] butt," using his penis. John Doe III and defendant masturbated together about five times.

Defendant argues this evidence consists of "very brief descriptions provided by the two minors [which] were insufficient to conclude that the possible redeeming value of

28

the work was lacking when the work could not be evaluated as a whole.  The evidence the matter was harmful is constitutionally insufficient."  We disagree.

In *Dyke*, the victim's testimony lacked any context by which a reasonable trier of fact could determine whether the matter was harmful.  Instead, the victim provided only a bare-bones recital of what she saw.  (*Dyke*, *supra*, 172 Cal.App.4th at p. 1385.)  Here, John Doe II provided a definition of pornography and distinguished it from the content of R-rated films.  He stated he had viewed pornography when he was younger, before defendant showed it to him.  In addition, John Doe II described what defendant showed him in detail, including the fact that the women's genitalia were visible.  John Doe III testified defendant showed him pornography on at least five occasions.  In the incident in question, defendant showed him a video of a man and a woman having sex, and he could see their genitals.

In *People v. Powell* (2011) 194 Cal.App.4th 1268 (*Powell*), the Court of Appeal acknowledged that nudity or depictions of sexual intercourse do not, by themselves, make a movie obscene.  (*Id*. at p. 1291.)  However, the court reasoned a victim's more detailed statement "makes all the difference.  What makes this case unlike *Dyke*, *supra*, 172 Cal.App.4th 1377, and persuades us that there is a minimum of evidence to sustain the conviction is that the victim here told Detective Buhay that in one sexually oriented movie 'some of their men parts and women parts weren't blocked.'  Penises, breasts, and vaginas featured in lewd displays as the actors 'did it,' i.e., engaged in sexual activity and not just kissing.  Notwithstanding the constitutional and definitional barriers to a conviction under section 288.2, subdivision (a), and the lack of detail in most of the victim's descriptions about the material defendant forced her to watch, we uphold the conviction against defendant's due process challenge because of the victim's description of seeing a movie in which actors engaged in simulated or unsimulated sexual activity while displaying all of those body parts.  The foregoing evidence suffices to uphold the

29

jury's verdict. Although the evidence is not rich in detail, it is nevertheless adequately descriptive." (*Powell*, at p. 1295.)

As in *Powell*, John Doe II's and John Doe III's descriptions are adequate to support the jury's finding that the material was harmful under section 288.2, subdivision (a). We note that in evaluating the sufficiency of the evidence, we review the record in the light most favorable to the judgment, and presume the existence of every fact and make all reasonable inferences supportive of the verdict. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Here, the evidence meets the minimum required for a reasonable trier of fact to conclude defendant forced the victims to watch obscene depictions within the meaning of section 313, subdivision (a), an act punishable under section 288.2, subdivision (a).

### Intent to Seduce

Defendant also challenges the sufficiency of the evidence on counts 2 and 5 that he showed John Doe II and John Doe III the materials with the intent to seduce them. In both counts, defendant argues, there was no evidence to show that he intended any physical contact between himself and the victims.

The seducing element of section 288.2, subdivision (b) requires that the perpetrator intended to entice the minor to engage in a sexual act involving physical contact between the perpetrator and the minor. Intending to entice a male minor to masturbate himself does not satisfy the seducing element of the statute. (*People v. Jensen* (2003) 114 Cal.App.4th 224, 239-240.) The purpose of section 288.2 is to prohibit using obscene material, as defined in section 313, subdivision (a), to groom young victims for molestation. (*Powell*, *supra*, 194 Cal.App.4th at p. 1287.)

The court instructed the jury that "An intent may be proved by circumstantial evidence." (CALCRIM No. 225.) The court also instructed on the distinction between direct and circumstantial evidence: circumstantial evidence is "evidence of another fact

30

or group of facts from which you may logically and reasonably conclude the truth of the fact in question." (CALCRIM No. 223.)

Rarely will the intent to seduce be susceptible to direct proof. By its nature, seduction often involves persuasion by subtle means. A seducer does not often declare his intentions. And so in count 2, defendant gave John Doe II alcohol and marijuana, and then showed the boy pornography and told him not to tell his mother. The object of his enticements was reasonably clear from these acts alone and was made even clearer in defendant's questions of whether John Doe II thought the women in the movie were "hot" and whether he masturbated. From these facts the jury could infer that defendant showed John Doe II the pornography, and gave him the alcohol and marijuana, to lessen John Doe II's inhibitions to engage in sex.

With regard to count 5, the evidence is even more compelling. Defendant had a long history of plying John Doe III with alcohol and marijuana, beginning when he was 10 years old. Defendant showed him pornography six times over the years. Defendant molested him the first time when he was 11. He sodomized John Doe III and then paid him. From these facts the jury could find circumstantial evidence that defendant's showing his victim pornographic material was part and parcel of defendant's efforts to entice him to continue to engage in sexual acts. We find sufficient evidence to support defendant's convictions on counts 2 and 5.

**Ability to Pay Attorney Fees**

Finally, defendant argues the court erred in requiring him to pay attorney fees because there was insufficient evidence of his ability to pay. In addition, defendant contends his claim is cognizant on appeal despite his failure to object below. In the alternative, defendant claims defense counsel performed ineffectively in failing to object to the fees.

31

*Background*

Following his arrest in September 2010, defendant remained in custody. The court set bail at $500,000. At the hearing to determine defendant's eligibility for appointment of the public defender, defendant stated he owned five vehicles worth a few hundred dollars each and received $939 a month in disability SSI (supplemental security income). Defendant had no savings and $58 in a checking account. Defendant purchased a plot of land for $25,000, on which he was making monthly payments of $150. The court concluded defendant did not have the ability to employ counsel and appointed the public defender.

At trial Joshua B. testified defendant gave him permission to pay defendant's bills with the money from his SSI checks, which were deposited directly into a bank account. Steven M. testified defendant charged him $600 in rent even though defendant paid only $550 in rent to the landlord. Beginning in June 2011 defendant paid Steven $200 a month to secure housing with Steven upon defendant's release.

Following sentencing, defense counsel estimated his fees at $37,000, expert fees at $7,500, and investigator fees at $10,000. The court noted that imposition of attorney fees and costs is subject to a defendant's ability to pay. Defendant stated he received $939 a month in benefits and owned a recreational vehicle. The bank had foreclosed on the land defendant purchased, and he had no interest in any other property.

The court ordered defendant to pay attorney fees. The court stated: ". . . [W]hat the court doesn't do is have to make a finding that fees and costs have to be reimbursed within a particular period of time. Because [defendant] is going to be remanded to the state Department of Corrections and Rehabilitation, there is a presumption that he might be . . . not able to pay for attorney's fees and costs, but I think based on the information the court has, I'm going to find that he does have an ability.

"And again . . . so far as the Director of Corrections and Rehabilitation can withhold from stipends and earnings. I don't know if that completely extends to their

ability to withhold from somebody's . . . like, if they have some type of benefits that come in from another source. But I am going to authorize the county to do that, to commence what could possibly be an order that that be considered as a basis or a source of reimbursement for the appointed attorney's fees.

". . . That's probably all I can do right now is just to try to put that in effect and find an ability to pay."

### *Discussion*

The People contend defendant waived his challenge to the imposition of attorney fees by failing to object at sentencing. We disagree.

This court has frequently held that in order to preserve a challenge to a fee or fine, a defendant must object in the trial court. (*People v. McCullough* (2013) 56 Cal.4th 589, 599; *People v. Crittle* (2007) 154 Cal.App.4th 368, 371; *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1467-1469.) However, in *People v. Viray* (2005) 134 Cal.App.4th 1186 (*Viray*), the appellate court carved out an exception to this requirement in cases involving reimbursement of attorney fees.

In *Viray*, the court found the defendant's right to effective assistance of counsel provided an exception to the forfeiture rule. The court explained: "We do not believe that an appellate forfeiture can properly be predicated on the failure of a trial attorney to challenge an order concerning *his own fees*. It seems obvious to us that when a defendant's attorney stands before the court asking for an order taking money from the client and giving it to the attorney's employer, the representation is burdened with a patent conflict of interest and cannot be relied upon to vicariously attribute counsel's omissions to the client. In such a situation the attorney cannot be viewed, and indeed should not be permitted to act, as the client's representative. Counsel can hardly be relied upon to contest an order when a successful contest will directly harm the interests of the

33

person or entity who hired him and to whom he presumptively looks for future employment." (*Viray*, *supra*, 134 Cal.App.4th at pp. 1215-1216.)

Given the facts, the *Viray* court reasoned that the defendant was not, at the time the fines were imposed, represented by counsel for the purposes of waiver. Indeed, it was defense counsel who brought the fees to the court's attention. (*Viray*, *supra*, 134 Cal.App.4th at p. 1216.) The situation in *Viray* mirrors the situation in the present case. Accordingly, we find the issue not waived by failure to object in the trial court.

Defendant challenges the sufficiency of the evidence supporting the trial court's finding that he has the ability to pay attorney fees. Section 987.8, subdivision (g)(2)(B) provides that "[u]nless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense." The trial court must determine the defendant's ability to pay at the time of sentencing. (§ 987, subd. (g)(2).)

Any finding of ability to pay must be supported by substantial evidence. Again, in evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Phillips* (1994) 25 Cal.App.4th 62, 71-72.)

The People argue sufficient evidence supports the court's finding: "[Defendant] had continued to receive $939 in SSI benefits every month while he was in jail pending trial. At the time of sentencing in October 2011, then, he would have received approximately $12,207 since his arrest in September 2010. [Joshua B.] had been cashing [defendant's] SSI checks and paying some bills with those funds. Out of that amount, there was enough money left over ever[y] month to pay [Steven M.] $200 a month for a few months. At one point, [defendant] had been charging [Steven] $600 a month in rent even though [defendant] was paying a total of $550 in monthly rent to the landlord. At the time of sentencing, [defendant] still owned certain vehicles, including the R.V. that

34

the court had seen in photographs during the trial. . . .  The trial court properly considered [defendant's] ability to earn wages while in prison.  [Citation.]  Thus, even assuming that [defendant] would stop receiving SSI benefits once in prison, there was sufficient evidence that [defendant] had assets and the ability to work in prison to support imposition of the attorney's fees order."  (Citations to record omitted.)

However, there was no evidence before the trial court as to how much of defendant's past SSI payments he had saved or the value of the vehicles he owned.  Given the record before us, we cannot find sufficient evidence to support the court's order for reimbursement of $47,000 in defense fees.  Therefore, we vacate the order imposing defense fees and remand the matter to the trial court to determine defendant's ability to pay them.

## DISPOSITION

The order requiring defendant to reimburse $47,000 in defense fees is vacated and the matter remanded to the trial court to determine defendant's ability to pay.  In all other respects, the judgment is affirmed.

                                        RAYE            , P. J.


We concur:


        HULL         , J.


        BUTZ         , J.


35