[No. A117955. First Dist., Div. Four. Apr. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LAWRENCE DYKE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B. and II.C.

COUNSEL

Richard T. Dudek and Jeffrey Kravitz for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RIVERA, J.**—Defendant David Lawrence Dyke appeals a judgment entered upon a jury verdict finding him guilty of sending or exhibiting harmful matter to a minor (Pen. Code,[1] § 288.2, subd. (a); count I) and misdemeanor sexual battery (§ 243.4, subd. (e)(1); count II). The court sentenced defendant to the two-year midterm on count I and stayed sentence on count II. We conclude the record does not contain sufficient evidence to support a factual finding that the television scenes that were shown to the minor constituted "harmful matter" within the current meaning of section 288.2, subdivision (a). Accordingly, we shall reverse the conviction as to count I and remand for resentencing.

## I. FACTS

A.S., a 16-year-old high school sophomore, was on her school's wrestling team. She became close friends with her teammate D.D., defendant's daughter. Defendant helped out with the wrestling team. He started coaching A.S. and taking her to tournaments.

On January 28, 2005, defendant and A.S. drove to defendant's home after a wrestling tournament. A.S. was to sleep at defendant's home because he was going to take her to the second day of the tournament the next day. When they arrived, D.D. was the only other person at home.

A.S. testified that defendant, D.D., and A.S. watched television in the living room. At some point, defendant sent D.D. to her room and stayed alone with A.S. He started flipping through the television channels, some of which showed pornographic material. Of the scenes A.S. saw, she specifically remembered two. One program showed a naked woman dancing. At that point, defendant said, " 'I shouldn't have this on because then you will have funny dreams and feel funny.' " Although A.S. initially testified that they watched this scene for about eight minutes, she later said it might have been for about a minute. The second program showed a naked woman and a naked man "having sex." The television showed only their upper bodies, from a side

---

[1] All undesignated statutory references are to the Penal Code.

angle, and the woman was on top. The scene was on for about 45 seconds. The scenes made A.S. feel uncomfortable. She stayed for a little while, and then told defendant she wanted to go to sleep.

Defendant took A.S. to the room where she was to sleep and left, but later returned. A.S. was lying in bed and he kneeled at the bedside, with his elbows on the bed. He started to speak to her and then there was a long and awkward silence that lasted about 25 seconds. Defendant placed his hand on A.S.'s breast, stroking and rubbing it. She felt very uncomfortable and pushed his hand away. Defendant then leaned over and kissed her mouth. A.S. turned away and he put his mouth on her ear. He then asked her if she was horny. A.S. said no, and he asked her if she wanted to be horny. A.S. again said no. Defendant asked her what she wanted to do, and A.S. responded that she wanted to go to sleep. He then said " 'I'm an adult. I shouldn't be doing this. I apologize,' " and left the room.

Defendant testified that on January 28, 2005, he drove A.S. back to his home after the wrestling tournament. After defendant, D.D., and A.S. had dinner, he joined the girls in the living room, where they were watching television, and started flipping through the television channels. Defendant denied that any pornographic shows came up while he was flipping through the channels. Defendant told A.S. and D.D. to go to bed, and the girls left together. Defendant then went to A.S.'s room, where he stood about two or three feet from the door. He gave her words of encouragement because she was depressed about having lost one of her matches that day. Defendant reached over, patted her on the shoulder, and told her not to worry. He walked out of the room, closed the door, and went to bed.

## II. DISCUSSION

A. *Evidence of Showing Harmful Material to a Minor*

Defendant contends the evidence is insufficient to support a conclusion that the television scenes he showed A.S. constituted harmful matter for purposes of section 288.2.

We review the conviction for substantial evidence. (*People v. Huggins* (1997) 51 Cal.App.4th 1654, 1656 [60 Cal.Rptr.2d 177].) Under this standard, we review the whole record "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) If the circumstances reasonably justify the finding, we cannot reverse merely because a contrary finding might also be reasonably deduced from the circumstances. (*People v. Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr.

529, 457 P.2d 321].) We will reverse only if it "clearly appear[s] that upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." (*Ibid.*)

### 1. *Statutory Background*

Section 288.2, subdivision (a) provides in material part: "Every person who, with knowledge that a person is a minor, . . . knowingly . . . exhibits . . . *any harmful matter, as defined in Section 313*, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail. [¶] A person convicted of a second and any subsequent conviction for a violation of this section is guilty of a felony." (Italics added.)

Defendant contends the evidence was insufficient to sustain the jury's verdict that the material exhibited to the minor was "harmful matter" within the meaning of section 313, subdivision (a). Section 313, subdivision (a) defines "harmful matter" as follows: " 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

The Legislature adopted the current definition of "harmful matter" in 1988. (Stats. 1988, ch. 1392, § 5, p. 4710.)[2] Prior to 1988, "harmful matter" had been defined as follows: "[M]atter taken as a whole, the predominant appeal of which to the average person, applying contemporary statewide standards, is to prurient interest, meaning a shameful or morbid interest in nudity, sex, or excretion, and *is patently offensive to the prevailing standards in the adult community as a whole with respect to what is suitable material for minors*, and lacks significant literary, artistic, political, educational, or scientific value for minors." (Stats. 1986, ch. 51, § 4, p. 132, italics added.)

■ In amending the statute in 1988, the Legislature deleted the above italicized language. Thus, the statutory definition of "harmful matter" no longer specifies that the material must be such that average adults would consider it patently offensive and unsuitable for minors. Instead, the current statute essentially "tracks" the three-prong test for obscenity articulated by

---

[2] "Under the provisions of § 9 of Stats. 1988, c. 1392, the 1988 amendments of [section 313] by c. 1378 and c. 1392 were given effect and incorporated in the form set forth in § 5 of c. 1932." (Historical and Statutory Notes, 48 West's Ann. Penal Code (2008 ed.) foll. § 313, p. 548, col. 2.)

the United States Supreme Court in *Miller v. California* (1973) 413 U.S. 15, 24 [37 L.Ed.2d 419, 93 S.Ct. 2607] (*Miller*). (*People v. Hsu* (2000) 82 Cal.App.4th 976, 992 [99 Cal.Rptr.2d 184] (*Hsu*).)

*Miller* considered the states' power to regulate " 'the intractable obscenity problem' " (*Miller, supra,* 413 U.S. at p. 16), and set out guidelines for regulating obscene materials. Under the *Miller* test, in determining whether material is obscene, the trier of fact must determine that each of the following three elements are present: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, [citation]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (*Id.* at p. 24.)

█ Thus, the modern *Miller* standard and the *current* definition of "harmful matter" in section 313 are virtually identical, with the exceptions that under section 313 the relevant community standard by which the material is evaluated is "statewide" and, in context, the work must lack serious literary, artistic, political, or scientific value *for minors.* In essence, then, to fall within the terms of section 288.2, subdivision (a), the material exhibited to the minor must be "obscene" as defined by *Miller,* except that its socially redeeming values must be of a nature that can be appreciated by a minor.[3] (*Miller, supra,* 413 U.S. at pp. 23–24.) If this test is not met, there is no violation of section 288.2, subdivision (a) even if the other elements of that statute are met. As to the first two prongs of the test for harmful matter, nothing in section 313 indicates that the "average person" applying "contemporary statewide standards" is anything other than an average *adult* applying *adult* standards, or that the determination of whether sexual conduct is depicted or described in a patently offensive way should be made using anything but *adult* standards.[4]

---

[3] We would assume such a measure would differ based upon the age of the minor; certain sexual portrayals may be viewed as having artistic value to a 16 year old, but not to a seven year old.

[4] It appears from the legislative history that the bill which made these changes to the definition of harmful matter was primarily directed toward expanding the general definition of obscene matter found in section 311 to be consistent with the standards articulated in *Miller.* In so doing, the Legislature made corresponding changes to the definition of harmful matter (§ 313, subd. (a)), but does not appear to have noted the different standard, referenced in *Miller,* applicable when the case involves mixed conduct and expression. In *Miller* the Supreme Court noted that state regulation of conduct that embodied both speech and nonspeech elements could be " 'sufficiently justified if . . . it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of

## 2. *Sufficiency of the Evidence*

■ Under *Miller*, the question of what is " 'patently offensive' " under the community standard obscenity test is essentially a question of fact. (*Miller, supra,* 413 U.S. at p. 30.) Thus, we consider whether a rational trier of fact could have found the television clips viewed by A.S. to be patently offensive under contemporary statewide standards. Under this test, "the primary concern" is that the communication be "judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." (*Miller, supra,* 413 U.S. at p. 33; see also *People v. Wiener* (1979) 91 Cal.App.3d 238, 245 [154 Cal.Rptr. 110].)

The sole evidence that the television programming A.S. viewed met the test for harmful matter was the testimony of A.S herself. There was no tangible evidence introduced at trial of precisely what A.S. saw. A.S. testified that while appellant was "flipping" through the channels of the television, she recalls seeing a naked female dancing, and a man and woman, from the waist up, "having sex." The camera angle was such that the lower portion of the couple could not be seen. The upper bodies of the two people were unclothed, and the woman was "on top." A.S. observed the female dancing for "[p]robably like eight minutes," and the couple apparently having sex for "maybe like 45 seconds."

■ We conclude there is insufficient evidence in the record to hold that the television images, as described by A.S, met the test for harmful matter.[5]

---

free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " (*Miller, supra,* 413 U.S. at p. 26, fn. 8.)

In our view, the earlier definition of harmful matter, contained in section 313 prior to its amendment in 1988 (Stats. 1986, ch. 51, § 4, p. 132 [offensive to the prevailing standards in the adult community "with respect to what is suitable material for minors"]), makes more sense in the context of exhibiting material for the purpose of seducing a minor, a situation that is clearly one of mixed conduct and expression. The Legislature, however, rewrote the statute defining harmful matter to comport with *Miller*—the irony being that, while expanding the definition of obscenity as a general matter it contracted the definition of harmful matter as applied in the specific crime of exhibiting material for the purpose of seducing a minor. Whether or not we agree with the wisdom of this approach, we cannot amend or alter the standard contained in the statute. We would encourage the Legislature to revisit this issue, given the potential consequences of so narrowly defining harmful matter when it is used to groom young victims for acts of molestation. We express no opinion, however, on this definition for purposes of section 313.1, which prohibits distribution or exhibition of harmful matter to minors, but does not include the elements of intent to arouse or gratify the lust or passions, or of intent to seduce the minor.

[5] While A.S. referred to what she saw as "pornography," there was no testimony as to what she meant by that term, or how broadly it may have been intended. In any case, as has been made clear by the review of the statutory history of section 313, it is not the minor's opinion that matters; the sexual conduct depicted must be judged patently offensive under a single contemporary statewide standard.

First, applying a contemporary adult standard, nudity alone is not per se obscene (see *Jenkins v. Georgia* (1974) 418 U.S. 153, 161 [41 L.Ed.2d 642, 94 S.Ct. 2750]), and the high court has stated that "all nudity cannot be deemed obscene even as to minors" (*Erznoznik v. City of Jacksonville* (1975) 422 U.S. 205, 213 [45 L.Ed.2d 125, 95 S.Ct. 2268]). Indeed, the definition of sexual conduct in a statute found in a companion chapter of the Penal Code includes a variety of sexual acts, but not simple nudity or nude dancing. (§ 311.4; see *Hsu, supra*, 82 Cal.App.4th at p. 993 [looking to § 311.4 to provide guidance on meaning of sexual conduct for purposes of § 313].) Likewise, portrayals of sexual activity are not ipso facto obscene (*Kois v. Wisconsin* (1972) 408 U.S. 229, 231–232 [33 L.Ed.2d 312, 92 S.Ct. 2245]), even if they may be characterized as "dismally unpleasant, uncouth, and tawdry" (*Manual Enterprises v. Day* (1962) 370 U.S. 478, 490 [8 L.Ed.2d 639, 82 S.Ct. 1432] (lead opn. of Harlan, J.)). ■ As the court stated in *Roth v. United States* (1957) 354 U.S. 476, 487 [1 L.Ed.2d 1498, 77 S.Ct. 1304], "sex and obscenity are not synonymous." Accordingly, in order to determine whether a portrayal of sex is patently offensive to the average adult, "[a] reviewing court must, of necessity, look at the context of the material, as well as its content." (*Kois, supra*, 408 U.S. at p. 231.)

What is missing from this record is any context by which the reasonable trier of fact can make this determination. There is only a bare-bones recital by A.S. of what she saw: a nude woman dancing and a naked couple having sex, shown from the waist up, and her own characterization of it as "pornography." Without more, neither we nor the jury are permitted to presume that such content is patently offensive to the average adult, applying statewide community standards.

■ Even if a reasonable jury could conclude that the television clips observed by A.S. "depict[] or describe[], in a patently offensive way, sexual conduct" (*Miller, supra*, 413 U.S. at p. 24), not all depictions of such conduct constitute harmful matter. Section 313, subdivision (a) also requires that the matter, "taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." The United States Supreme Court has made clear that even a work that depicts sexual conduct in a patently offensive way—and even a work involving participants who are minors—does not meet the definition of obscenity unless, as a whole, it lacks serious literary, artistic, political, or scientific value. In *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 239, 258 [152 L.Ed.2d 403, 122 S.Ct. 1389] (*Ashcroft*), the high court struck down as unconstitutional certain provisions of the Child Pornography Prevention Act of 1996 (CPPA) (18 U.S.C. § 2251 et seq.). The court concluded that the CPPA was overbroad in the types of materials it deemed obscene and, therefore, illegal under that federal law. The court noted that the year before the opinion was written, one of the Academy Award nominees for Best Picture was Traffic (USA Films 2000), in which a 16-year-old addict was

trading sex for drugs. It observed further that the year before that, the film American Beauty (DreamWorks Pictures 1999) won the Academy Award for Best Picture, a movie in which "a teenage girl engages in sexual relations with her teenage boyfriend, and another yields herself to the gratification of a middle-aged man. The film also contains a scene where, although the movie audience understands the act is not taking place, one character believes he is watching a teenage boy performing a sexual act on an older man." (*Ashcroft*, at pp. 247–248.)

■ The court went on to comment: "Whether or not the films we mention violate the CPPA, they explore themes within the wide sweep of the statute's prohibitions. If these films, or hundreds of others of lesser note that explore those subjects, contain a single graphic depiction of sexual activity within the statutory definition, the possessor of the film would be subject to severe punishment without inquiry into the work's redeeming value. This is incon- ˑ sistent with an essential First Amendment rule: The artistic merit of a work does not depend on the presence of a single explicit scene. See *Book Named 'John Cleland's Memoirs of a Woman of Pleasure'* v. *Attorney General of Mass.* [(1966)] 383 U.S. 413, 419 [16 L.Ed.2d 1, 86 S.Ct. 975] (plurality opinion) ('[T]he social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness'). Under *Miller*, the First Amendment requires that redeeming value be judged by considering the work as a whole. Where the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive. See *Kois* v. *Wisconsin*[*, supra*,] 408 U.S. 229, 231 . . . . For this reason, and the others we have noted, the CPPA cannot be read to prohibit obscenity, because it lacks the required link between its prohibitions and the affront to community standards prohibited by the definition of obscenity." (*Ashcroft, supra*, 535 U.S. at pp. 248–249.)

■ It is impossible on this record to conclude that the television segments A.S. observed did not contain "serious literary, artistic, political, or scientific value for minors." (§ 313, subd. (a).) Was the dance by the unclothed female lurid, artistic, or even a cultural or tribal dance? There is no way to know and no reasonable basis for inferring that it lacked such value. As to the 45-second glimpse of the couple presumably having sexual intercourse, was the clip part of a tawdry adult film, a former Academy Award winner being shown on television that night, or even a brief scene from Shakespeare's Romeo and Juliet?[6] Once again the record provides no basis for drawing a reasonable inference that either clip lacked "serious

---

[6] In *Ashcroft*, the United States Supreme Court pointed out this Shakespeare work "has inspired no less than 40 motion pictures, some of which suggest that the teenagers consummated their relationship." (*Ashcroft, supra*, 535 U.S. at p. 247.)

literary, artistic, political, or scientific value for minors." Without that evidence, a reasonable jury would not be able to judge the clips viewed by A.S. to be "harmful matter," as defined in section 313.

Accordingly, in the absence of evidence that the material defendant showed to A.S. was "harmful matter" as defined in section 313, defendant's conviction of violating section 288.2 must be reversed.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III.  DISPOSITION

Defendant's conviction of violating section 288.2, subdivision (a) (count I) is reversed, and the matter is remanded for resentencing. In all other respects, the judgment is affirmed.

Ruvolo, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied April 16, 2009, and on May 7, 2009, the opinion was modified to read as printed above.

---

*See footnote, *ante*, page 1377.