Filed 5/22/14  P. v. Deng CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES MAJOK DENG,<br><br>    Defendant and Appellant.</td><td>H038016<br>(Santa Clara County<br> Super. Ct. No. C1091996)</td></tr>
</table>

Defendant James Majok Deng appeals his convictions, following a court trial, for felony distributing harmful matter to a minor with intent to seduce (former Pen. Code, § 288.2, subd. (a))[1] and misdemeanor annoying or harassing a minor (§ 647.6, subd. (a)(1)).  Before trial, defendant unsuccessfully moved to suppress all evidence obtained as a result of an allegedly illegal traffic stop.  On appeal, defendant contends that the trial court erred in denying his motion to suppress because the traffic stop was an unlawful detention and that his attorney provided ineffective assistance of counsel related to the suppression hearing.  Alternatively, defendant claims there was insufficient evidence to convict him of either offense, that various felony probation conditions are unconstitutional, and that his sentence violates section 654.

For the reasons stated here, we will find there was: (1) adequate suspicion to

---

[1]  Unspecified statutory references are to the Penal Code.  After defendant's arrest, the Legislature made minor amendments to section 288.2 in 2011 and 2012 before repealing and reenacting section 288.2 in its entirety in 2013.  (Stats. 2011, ch. 15, § 317; Stats. 2012, ch. 43, § 16; Stats. 2013, ch. 777, § 1.)

justify defendant's detention; (2) sufficient evidence to support his felony conviction under former section 288.2, subdivision (a); (3) sufficient evidence to support his misdemeanor conviction under section 647.6, subdivision (a)(1); and (4) defendant's section 654 claim is unripe because the trial court suspended imposition of sentence on both counts. We will also modify five of defendant's felony probation conditions.

Defendant's appellate counsel also filed a petition for writ of habeas corpus, alleging ineffective assistance of counsel related to trial counsel's performance at the suppression hearing, which we ordered considered with this appeal. We dispose of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## I.  TRIAL COURT PROCEEDINGS

This factual background is based on defendant's interrogation by Officer Alejandro Ortiz of the City of San Jose Police Department and the testimony of Officer Ashley Weger of the City of San Jose Police Department at the hearing on defendant's motion to suppress, as well as the trial testimony of Officer Weger, Officer Ortiz, and the victim.

On August 19, 2010, a mother picking up her child from an elementary school at the corner of Taper Lane and Tobago Avenue in San Jose called the police at 5:55 p.m. after observing a suspicious vehicle parked on Taper Lane. The mother stated that the vehicle, a gray or silver Toyota Celica, contained one black male (later identified as defendant) in his late twenties or early thirties, who was bald with a mustache. Defendant was reportedly "looking at some of the juveniles that were there at the school, specifically a young boy."

Officer Weger was on duty and was dispatched to respond to the report. At the time of the dispatch, the officer did not have any information about how long defendant's vehicle had been present. When Officer Weger arrived at the intersection of Taper and Tobago ten minutes after the initial report, the officer did not see a car matching the

description in the immediate area. As Officer Weger drove in the surrounding area, she saw a gray or silver Celica traveling northbound on Tobago roughly eight houses away from the intersection with Taper heading in the same direction as the officer's patrol car. The Celica then pulled into a driveway to turn around, allowing Officer Weger to see that the driver matched the description provided in the reporting call. As defendant reversed the Celica, Officer Weger made eye contact with him. Defendant, after hesitating briefly, completed his turn and proceeded southbound on Tobago toward the intersection with Taper.

Before Officer Weger and defendant passed one another, the officer activated her "manual siren" (described as a "short beep or chirp"), "told him to pull over to the side of the road," and pointed to the side of the road with her left hand. Defendant momentarily stopped his car on the side of Tobago but, as Officer Weger made a U-turn to pull up behind defendant's car, defendant "pulled away from the curb and . . . accelerated around the corner" out of the officer's sight. Defendant did not break traction when proceeding around the corner but made the turn more quickly "than you would expect" traffic to travel on that street. Regarding defendant's sudden acceleration around the corner, Officer Weger reported to her dispatch officer that there could be a language barrier between defendant and the officer. Officer Weger completed her U-turn, turned onto Taper, and stopped her patrol car behind defendant, who was pulled over on the north curb of Taper. At the time of the traffic stop, Officer Weger observed children in the area.

When Officer Weger approached defendant's car and asked him why he was in the area, defendant told her he was looking for a church. The location of the church defendant provided, however, was not close to their present location. During the traffic stop, the parent who made the original complaint returned to the area at Officer Weger's request and confirmed that defendant was the same person she originally saw near the school. Officer Ortiz arrived during the stop and joined Officer Weger at defendant's car.

Upon noticing a cellular phone in defendant's car, Officer Ortiz received permission from defendant both to inspect the phone and to turn it on. Officer Ortiz reviewed the text messages on defendant's phone, which were admitted into evidence at trial. The phone's "outbox" contained a text message sent to what was later determined to be the victim's phone number that said "Hey babe[.]" Another message stated "Hey i thougn u gonna give address so that we can hang out fooling around there." (*Sic.*)

Based on the text messages he reviewed, Officer Ortiz suspected defendant was in the area to meet someone. When the officer asked defendant if he was there to meet someone, defendant stated he was, and admitted that " '[s]he told me she was 13 or 14.' " Upon hearing this, Officer Ortiz arrested defendant and took him to the police station for a recorded interrogation.

At the beginning of the interrogation, Officer Ortiz informed defendant of his *Miranda*[2] rights, which defendant waived. Defendant told Officer Ortiz that he met the victim (Doe) on the MySpace online social network about two weeks before his arrest. Although Doe's MySpace profile indicated she was 20 years old, defendant admitted Doe told him at least two times that she was between 13 and 15 years old. Defendant claimed that he wished to meet Doe in person to verify her age because he could get into trouble if she was a minor.

At some point before the day of his arrest, Doe allegedly asked defendant if they could have "phone sex." To give defendant an example because he was not familiar with the phrase, Doe said defendant should "jack up," which defendant understood to mean masturbate. Later, Doe apparently asked defendant if he had "jack[ed] up" and defendant said "yeah."

Based on this evidence and statements from Doe, defendant was charged by complaint with: (count 1) felony attempted lewd or lascivious act on a child under 14

---

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436.

(§§ 288, subd. (a), 664); and (count 2) felony distributing or exhibiting harmful matter to a minor with intent to seduce (former § 288.2, subd. (a)). In an amended information filed in November 2011, a misdemeanor charge of annoying or harassing a minor (§ 647.6, subd. (a)(1)) was added as count 3.

In April 2011, defendant moved to suppress "all tangible and intangible evidence and observations and fruits thereof, relating to an illegal search and seizure by officers of the San Jose Police Department, on or about August 19, 2010 . . . ." At the hearing on defendant's motion, the court heard testimony from Officer Weger (summarized above) as well as arguments regarding the lawfulness of the detention. In denying the motion to suppress, the court concluded that Officer Weger had reasonable suspicion to stop defendant based on the reporting mother's suspicion and defendant's continued presence in the area ten minutes later when the officer arrived. Further, "that suspicion was only heightened" when defendant accelerated around the corner. Finally, the court stated that its decision was supported by "a strong public interest in protecting children and the level of scrutiny we give to behavior of persons around school yards and young children . . . ."

After the court denied the motion to suppress, the People agreed to dismiss count one and defendant waived his right to a jury trial on counts two and three in return for the People's promise to not seek a prison sentence if defendant was convicted of count two. At the court trial in January 2012, Doe, who was 12 at the time of defendant's arrest and 14 at the time of trial, testified about her interactions with defendant. Doe confirmed that they met on MySpace when she accepted a "friend" request from defendant. Doe also confirmed that her MySpace profile listed her age as 20 years old even though she was actually only 12. Doe initially communicated with defendant on MySpace through personal messages (similar to email) and instant messages. Doe testified that she eventually exchanged phone numbers with defendant and, after having her memory refreshed by her earlier statements to the police, confirmed that she informed defendant she was 12 years old before they exchanged numbers.

When asked whether she ever talked about sexual topics with defendant, Doe confirmed she had but was vague regarding details. She stated that defendant talked about masturbation and about his "penis" being "excited." Doe's testimony was inconsistent regarding whether they discussed sexual topics via oral communications or telephone text messages. On direct examination, she indicated they occurred via text message. On re-direct examination, however, she testified that the discussion of defendant's penis being excited occurred "during the phone conversation."

Apart from the discussion of masturbation, defendant apparently did not discuss any other sexual topics with Doe. Doe stated she did not remember whether defendant ever told her anything about wanting to have sex with her and that he never talked to her "about anything specific that he wanted [her] to do . . . ." Doe stated there was no discussion of sexual topics on the day defendant was arrested.

Regarding the day of defendant's arrest, Doe testified that she responded to defendant's request that they meet in person by telling him that her house was near McLaughlin Road and Taper Lane. Though she gave him the general location of her house, Doe testified she was not actually planning to meet him and that she became frightened when she realized he was coming to the area.

The court found defendant guilty of both count two, felony distributing harmful matter to a minor with intent to seduce (former § 288.2, subd. (a)), and count three, misdemeanor annoying or harassing a minor (§ 647.6, subd. (a)(1)). This timely appeal followed.

## II. DISCUSSION

### A. LAWFULNESS OF DEFENDANT'S DETENTION

The trial court determined that Officer Weger had reasonable suspicion to stop defendant when she activated her manual siren and pointed to the side of the road and "that suspicion was only heightened" when defendant accelerated around the corner. On

appeal, defendant argues that Officer Weger did not have reasonable suspicion that defendant was involved in criminal activity when she stopped his car.

In reviewing the denial of a motion to suppress, we defer to the trial court's findings of fact if they are supported by substantial evidence and exercise our independent judgment to determine the lawfulness of the search or seizure. (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922.) In the traffic stop context, "a police officer can legally stop a motorist *only* if the facts and circumstances known to the officer support at least a reasonable suspicion that the driver has violated the Vehicle Code or some other law." (*Id.* at p. 926.) Put another way, "[a] detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*).)

To review the reasonableness of defendant's detention, we must first determine the point at which defendant was "seized" for Fourth Amendment purposes. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ' "by means of physical force or show of authority," ' terminates or restrains his freedom of movement, [Citations] . . . . " (*Brendlin v. California* (2007) 551 U.S. 249, 254 (*Brendlin*).) A seizure through a show of authority occurs when a reasonable person would have believed he or she was not free to leave or to decline an officer's request. (*People v. Zamudio* (2008) 43 Cal.4th 327, 341 (*Zamudio*).) Importantly, however, though "[a] police officer may make a seizure by a show of authority and without the use of physical force, . . . there is no seizure without *actual submission* . . . ." (*Brendlin, supra,* at p. 254, italics added.)

The United States Supreme Court's opinion in *California v. Hodari D.* (1991) 499 U.S. 621 (*Hodari D.*), is instructive. In *Hodari D.*, "four or five youths" (including Hodari) who were huddled around a car late at night in a "high-crime area" fled on foot

when they saw an unmarked police car approaching. (*Id.* at pp. 622-623.) While fleeing, Hodari discarded a small object that turned out to be crack cocaine before being tackled by a police officer and arrested. (*Id.* at p. 623.) In attempting to suppress the evidence of the crack cocaine, Hodari argued he was seized for Fourth Amendment purposes at the moment he saw the police officer running toward him. (*Ibid.*) The Supreme Court disagreed, stating that even if the police officer's "pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled." (*Id.* at p. 629; accord *United States v. Baldwin* (2007) 496 F.3d 215, 218 [" '[A]n order to stop must be obeyed or enforced physically to constitute a seizure.' [Citation.]"].) In so holding, the court reasoned that given the risk to the public associated with street pursuits, "compliance with police orders to stop should . . . be encouraged." (*Hodari D., supra,* at p. 627.)

Applying this rule to the facts as determined by the trial court, Officer Weger made a show of authority when she activated her manual siren and physically pointed to the side of the road with her hand because a reasonable person would have believed he or she was not free to leave or to decline the officer's demand to pull over.[3] (*Zamudio, supra,* 43 Cal.4th at p. 341.) However, defendant did not immediately submit to that show of authority because, despite stopping momentarily on Tobago, he accelerated around the corner onto Taper Lane and out of Officer Weger's sight before she could turn around and pull up behind him. Because of this delayed submission, defendant was not seized for purposes of the Fourth Amendment until he submitted to Officer Weger's authority by coming to a complete stop on Taper Lane.

---

[3] We note that at oral argument counsel for defendant argued that defendant was not detained until he stopped on Taper Lane and Officer Weger ordered him to put his hands on the steering wheel. This distinction is irrelevant to our analysis because of defendant's delayed submission to Officer Weger's show of authority.

Turning to the reasonableness of the detention, when she pulled defendant over, Officer Weger knew from her dispatcher that a mother picking up her child from the school at the corner of Taper and Tobago saw a bald, black male with a mustache sitting in a gray or silver Toyota Celica staring at children. Though neither the car nor the driver were at the corner when the officer arrived ten minutes later, Officer Weger saw a car matching the description near the intersection and then witnessed that car driving back toward the location of the citizen complaint. Seeing that the driver also matched the description provided, Officer Weger made a show of authority and directed defendant to pull over. Instead of stopping and allowing the officer to approach, defendant stopped momentarily, then took off around the corner and eventually stopped again. Defendant's temporary flight, combined with Officer Weger's observations and the information provided by the caller, (*People v. Ramey* (1976) 16 Cal.3d 263, 269 ["private citizens who are witnesses to or victims of a criminal act, absent some circumstance that would cast doubt upon their information, should be considered reliable"]), constituted "specific articulable facts that, considered in light of the totality of the circumstances, provide[d] some objective manifestation" that defendant might have been involved in criminal activity. (*Souza, supra,* 9 Cal.4th at p. 231; see also *id.* at p. 235 ["even though a person's flight from approaching police officers may stem from an innocent desire to avoid police contact, flight from police is a proper consideration—and indeed can be a key factor—in determining whether in a particular case the police have sufficient cause to detain."].)[4]

---

[4] Although we find that there was reasonable suspicion for defendant's detention, we note a significant factual misstatement in the Respondent's Brief that "[defendant] immediately started to leave without any child in his car when the officer arrived at the school . . . ." When asked at the suppression hearing whether she actually saw defendant's car in front of the school when she arrived, Officer Weger unequivocally stated "On Taper, no." The prosecutor made the same argument at the suppression hearing and was immediately interrupted and corrected by the court. Because it goes directly to the level of suspicion Officer Weger had when she detained defendant, the

Because we conclude that defendant's detention was lawful, we need not determine whether defendant's trial counsel was ineffective in failing orally to specify the evidence to be suppressed.

**B. SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE FELONY CONVICTION**

Defendant contends there was insufficient evidence to support his felony conviction for distributing harmful matter to a minor with intent to seduce. (Former § 288.2, subd. (a).) Defendant claims his communications with Doe did not constitute "matter" or "harmful matter," as those terms are defined in section 313. Additionally, defendant contends there was insufficient evidence of his specific intent to seduce Doe.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We will affirm a conviction if " ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 224 (*Alvarez*), italics omitted.)

**1. Defendant's Communication Constituted "Matter"**

The trial court found defendant guilty of violating former section 288.2, subdivision (a) as a felony. At the time of defendant's communications with Doe, section 288.2, subdivision (a) stated: "Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter, as defined in Section 313, to a minor with the intent of arousing,

mischaracterization is significant. However, at oral argument the Attorney General recognized and apologized for the misstatement.

appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail." (Former § 288.2, subd. (a).)

" 'Harmful matter' " is defined in section 313, subdivision (a) as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." (§ 313, subd. (a).) Subdivision (b) of section 313 further defines " 'matter' " as: "any book, magazine, newspaper, video recording, or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription, or mechanical, chemical, or electrical reproduction or any other articles, equipment, machines, or materials. 'Matter' also includes live or recorded telephone messages when transmitted, disseminated, or distributed as part of a commercial transaction." (§ 313, subd. (b).)

Relying on the last sentence in section 313, subdivision (b), defendant claims that because his communications with Doe were noncommercial "live or recorded telephone messages," they did not constitute "matter" for purposes of section 313. Because the messages were not "matter," defendant continues, they could not constitute "harmful matter" under section 313 or former section 288.2, subdivision (a). The People respond that "[t]he harmful matter in this case was communicated by text message not a verbal telephone conversation" and that text messages are "written material" that meet the definition of matter. (Citing § 313, subd. (b) [" 'Matter' means any . . . written material"].)

Before turning to whether defendant's communications fall within the prohibition of former section 288.2, subdivision (a), we must first determine the form of defendant's

communications with Doe. The record is ambiguous on that point. Both the victim and defendant were unclear in their respective statements regarding how the discussion of masturbation occurred. During defendant's police interrogation, he was broadly asked if he "ever talked to [Doe] about sex" without the means of communication being specified. Defendant said that Doe asked him to have "phone sex," but he did not specify the means by which that idea was communicated. Later in the interrogation, defendant talks about "call[ing]" Doe and talking about masturbation, suggesting a verbal communication, but also said he talked about that topic "when we text, yeah." Similarly, the victim initially testified on direct examination that defendant talked about masturbation "on text" but then on re-direct answered "Yes" when the prosecutor asked if defendant talked about masturbation "during the phone conversation." Thus, the exchanges about masturbation may have been via oral message, text message, or a combination of the two. The trial court did not specifically reconcile the testimony but did state in announcing its guilty verdict as to count two that, "in the Court's mind, a phone conversation regarding masturbation is covered by [section] 288.2."

To determine whether defendant's communications constituted "matter" for purposes of former section 288.2, we begin with the statutory language and give words their usual, ordinary meaning. (*People v. Canty* (2004) 32 Cal.4th 1266, 1276.) If the language is unambiguous, we follow its plain meaning. (*Ibid*.) If it is ambiguous, we may determine " 'whether the literal meaning of a measure comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.' " (*Ibid*., quoting *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.) "[L]egislative history of the statute . . . maybe be considered in ascertaining the legislative intent." (*Ibid.*)

Finally, we must avoid statutory interpretations that would lead to absurd consequences. (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)

When former section 288.2, subdivision (a) and section 313, subdivision (b) are read together, an ambiguity emerges. Former section 288.2, subdivision (a) appears to prohibit distribution of harmful matter by *any* live or recorded telephone message while section 313, subdivision (b) could be read to limit that prohibition to live or recorded telephone messages "distributed as part of a commercial transaction." To determine the intent of the Legislature, we turn to the legislative history of the sections.

In 1988, the Legislature amended section 313, subdivision (b) to add the following sentence: " 'Matter' also includes live or recorded telephone messages when transmitted, disseminated, or distributed as part of a commercial transaction." (Stats. 1988, ch. 1392, § 5.) The Legislature passed this amendment in order to make businesses offering live or recorded pornography over the telephone liable for allowing minors to access sexually explicit content. (County of Los Angeles, Letter to Chairman of Senate Judiciary Committee in Support of AB 3568, June 23, 1988; Assem. 3d reading analysis of Assem. Bill No. 3568 (1987-1988 Reg. Sess.) as amended Aug. 4, 1988, p. 2 ["According to the author, the purpose of this bill is to update the state's existing obscenity laws to reflect the new technology being used to promote pornography through the use of live or prerecorded telephone messages."].)

In February 1989, Assembly Bill 1008 was introduced to amend section 313.2, a section that provides exemptions for parents and guardians who distribute harmful matter to their children. (Assem. Bill No. 1008 (1989-1990 Reg. Sess.) as introduced Feb. 28, 1989.) The bill was later amended to leave section 313.2 unchanged and instead add a new section 288.2 to the Penal Code. (Stats. 1989, ch. 1316, § 1.) The purpose of the law was to prevent "[c]hild molesters who are parents and step-parents [from] shield[ing] themselves by claiming the parental exemption" contained in section 313.2. (Assem. 3d reading analysis of Assem. Bill No. 1008 (1989-1990 Reg. Sess.) as amended June 27,

1989, p. 2.) Thus, the Legislature's intent in enacting former section 288.2 was prohibiting *individuals* from distributing harmful matter to minors.

In light of the clear legislative intent to criminalize the behavior of individuals rather than businesses, as well as the explicit inclusion of "live or recorded telephone messages" as a prohibited means of distribution without any mention of commercial transactions, we find that former section 288.2 applied to distribution of *all* live or recorded telephone messages regardless of whether they are part of a commercial transaction. An alternative interpretation would lead to absurd results because it would exempt noncommercial live or recorded telephone messages from prosecution under former section 288.2 even though that section was explicitly intended to prohibit noncommercial distribution. Defendant argues that any ambiguity between former section 288.2 and section 313 must be resolved in his favor because the two possible interpretations are reasonable and " 'stand in relative equipoise . . . .' " (Quoting *People v. Jones* (1988) 46 Cal.3d 585, 599.) However, we find the alternative interpretation exempting noncommercial live or recorded telephone messages from prosecution under former section 288.2 unreasonable, therefore making the *Jones* rule inapplicable.

We therefore find that former section 288.2 prohibited the distribution of harmful matter by all live or recorded telephone messages, regardless of whether they were part of a commercial transaction. Though the record before the trial court was ambiguous regarding defendant's method of communication with minor, "the power to . . . resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." (*People v. Lawler* (1973) 9 Cal.3d 156, 160.) In light of this rule, we construe the trial court's finding that the communications occurred during a "phone conversation" as an implied finding that at least some of the masturbation communications occurred during a live phone call and therefore came

within the prohibition of former section 288.2, subdivision (a).  For this reason, we need not determine whether a text message constitutes a "live or recorded telephone message."

## 2.  Defendant's Communication Constituted "Harmful Matter"

Having determined that defendant's communication constituted "matter," we turn to whether it was "harmful matter," which section 313, subdivision (a) defines as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."  (§ 313, subd. (a).)  The court in *People v. Dyke* (2009) 172 Cal.App.4th 1377 (*Dyke*), analyzed the definition of harmful matter and determined that "the current statute essentially 'tracks' the three-prong test for obscenity articulated by the United States Supreme Court in *Miller v. California* (1973) 413 U.S. 15, 24 [37 L.Ed.2d 419, 93 S.Ct. 2607] (*Miller*)."  (*Id.* at pp. 1382-1383.)  The *Dyke* court observed that the "harmful matter" definition's only deviations from *Miller*'s adult obscenity standard are that under section 313 "the relevant community standard by which the material is evaluated is 'statewide' [rather than community-based] and, in context, the work must lack serious literary, artistic, political, or scientific value *for minors*."  (*Dyke, supra,* at p. 1383, original italics.)  In *People v. Powell* (2011) 194 Cal.App.4th 1268 (*Powell*), discussed in greater detail *post*, this court cited the foregoing analysis from *Dyke* with approval in a case with facts similar to those in *Dyke*.  (*Id.* at p. 1290.)

Despite agreeing that the definition of "harmful matter" generally tracks *Miller*'s obscenity standard, the People argue that "*Dyke* was wrongly decided and should not be followed."  The People quote extensively from *Dyke*'s discussion of section 313's legislative history, which noted that although the purpose of amendments leading to the current version of section 313 was to broaden the definition of obscenity, the amendments "contracted the definition of harmful matter as applied in [section 288.2]."

(*Dyke, supra*, 172 Cal.App.4th at p. 1383, fn. 4.)  In light of this legislative intent, the People continue, we should "apply section 313 in a way that is unencumbered by the adult obscenity standard of the [*Miller*] test."

As noted above, to determine the meaning of a statute, we give the words in a statute their usual, ordinary meaning.  (*Canty, supra,* 32 Cal.4th at p. 1276.)  If the language is unambiguous, we follow its plain meaning.  (*Ibid*.)  Here, we find nothing ambiguous about the definition of "harmful matter" in section 313, subdivision (a), and will apply the section's modified *Miller* test to the facts found by the trial court to determine whether any rational trier of fact could find defendant's communications "patently offensive" beyond a reasonable doubt.  (§ 313, subd. (a); *Alvarez, supra,* 14 Cal.4th at p. 224.)

A brief survey of cases involving section 288.2 convictions is instructive.  In *Dyke,* for example, while flipping through television channels, the defendant showed the victim "a naked female dancing, and a man and woman, from the waist up, 'having sex.' "  (*Dyke, supra,* 173 Cal.App.4th at p. 1384.)  The court found that, without more, those facts were insufficient to meet the definition of harmful matter.  (*Id.* at pp. 1384-1385.)

The *Dyke* court reviewed judicial interpretations of obscenity, noting that " 'sex and obscenity are not synonymous.' "  (*Dyke, supra,* 173 Cal.App.4th at p. 1385, quoting *Roth v. United States* (1957) 354 U.S. 476, 487.)  The court explained that "portrayals of sexual activity are not ipso facto obscene [citation], even if they may be characterized as 'dismally unpleasant, uncouth, and tawdry' (*Manual Enterprises v. Day* (1962) 370 U.S. 478, 490 [8 L.Ed.2d 639, 82 S.Ct. 1432] (lead opn. of Harlan, J.))."  (*Dyke, supra,* at p. 1385.)  The court concluded that "[w]ithout more, neither we nor the jury are permitted to presume that such content is patently offensive to the average adult, applying statewide community standards."  (*Ibid.*)

We described an example of patently offensive conduct in *People v. Jensen* (2003) 114 Cal.App.4th 224 (*Jensen*). In *Jensen*, the defendant engaged in numerous conversations via instant message with police officers posing as minors during which he discussed sexual topics in graphic detail, including extended discussions of how the defendant hoped to engage in sexual acts with the supposed minors. (*Id.* at pp. 227-236.) The defendant also transmitted naked photographs, including one showing three individuals engaged in sexual acts with one another. (*Id.* at pp. 227-228.) Though the defendant's conviction was reversed due to an erroneous jury instruction related to one of the intent elements of the offense, (*id.* at pp. 239-241), *Jensen* provides an example of the type of conduct section 288.2 is meant to criminalize.

A closer case was presented by the facts in *Powell.* The victim, who was 10 years old or younger, testified that the defendant showed her " 'pornographic movies' " before sexually assaulting her, and other evidence indicated that the assaults were "always preceded by the showing of pornographic movies." (*Powell, supra,* 194 Cal.App.4th at pp. 1285-1286.) The court expressed concern about whether that constituted "harmful matter" but ultimately concluded there was "a minimum of evidence to sustain the conviction" because the victim described seeing "[p]enises, breasts, and vaginas featured in lewd displays as the actors 'did it,' i.e., engaged in sexual activity and not just kissing." (*Id.* at p. 1295.)

Construing the evidence here in the light most favorable to the judgment, (*Lindberg, supra,* 45 Cal.4th at p. 27), defendant communicated with Doe about masturbation. Doe testified that she and defendant talked about masturbation and that defendant talked about his "penis" being "excited." These were the only specific details Doe could remember regarding their communications. Doe stated she did not remember whether defendant ever told her anything about wanting to have sex with her and that he never talked to her "about anything specific that he wanted [Doe] to do . . . ." There was

also no evidence that defendant transmitted any pictures or videos to Doe or that defendant forced Doe to view any material of that nature.

Though the evidence presented by the prosecution is far from overwhelming, we conclude that a reasonable trier of fact could have found that it met the definition of "harmful matter." (§ 313, subd. (a).) An "average person, applying contemporary statewide standards" would find that a description of a man's penis being excited "appeals to the prurient interest . . . ." (*Ibid.*) There was no evidence to suggest that the description had any "literary, artistic, political, or scientific value for minors." (*Ibid.*) The final element—whether the communication "describe[d] in a patently offensive way sexual conduct"—presents a more difficult question. (*Ibid.*) Though " 'sex and obscenity are not synonymous,' " (*Dyke, supra,* 173 Cal.App.4th at p. 1385, quoting *Roth, supra,* 354 U.S. at p. 487), we find that the prosecution presented a minimum of evidence to sustain the conviction.

### 3. Defendant Had Specific Intent to Seduce Doe

Former section 288.2 prohibited the knowing distribution of harmful matter "with the intent or for the purpose of seducing a minor . . . ." As we noted in *Jensen*, "the 'seducing' intent element of the offense requires that the perpetrator intend to entice the minor to engage in a sexual act involving physical contact between the perpetrator and the minor." (*Jensen, supra,* 114 Cal.App.4th at pp. 239-240.) Defendant claims the prosecution did not provide substantial evidence of defendant's intent to seduce Doe at the time of the harmful communications. We disagree.

As noted by the trial court, the prosecution provided evidence that defendant communicated harmful matter to Doe with knowledge that she was a minor and that he subsequently attempted to meet her in person. The prosecution also provided text messages sent by defendant to Doe on the day of his arrest. The earliest of those text messages greeted Doe with "[h]ey babe." Defendant then asked Doe for her address "so that we can hang out fooling around there." (*Sic.*) Later, he asked her "[w]hat cloth u

wear?" (*Sic.*) Though these text messages occurred after the masturbation conversation, a rational trier of fact could have concluded that by "fooling around" defendant meant sexual contact, that his interest in "fooling around" with Doe predated the text messages, and that defendant thus had a specific intent to seduce Doe when he had the masturbation conversation with her. In sum, there was sufficient evidence to support defendant's felony conviction under former section 288.2.

## C. SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE MISDEMEANOR CONVICTION

Defendant claims there was insufficient evidence to show that he violated section 647.6, subdivision (a)(1), which punishes "[e]very person who annoys or molests any child under 18 years of age . . . ."

The Supreme Court discussed this offense in detail in *People v. Lopez* (1998) 19 Cal.4th 282. In *Lopez*, the court explained that an individual can violate section 647.6, subdivision (a)(1) without touching the victim. (*Id.* at p. 289.) The subdivision requires "(1) conduct a ' "normal person would unhesitatingly be irritated by" ' [citations], and (2) conduct ' "motivated by an unnatural or abnormal sexual interest" ' in the victim [citations]." (*Ibid.*) The court continued that "the words 'annoy' and 'molest' . . . are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person." (*Ibid.*) Finally, "to determine whether the defendant's conduct would unhesitatingly irritate or disturb a normal person, we employ an *objective* test not dependent on whether the child was in fact irritated or disturbed." (*Id.* at p. 290.)

Applying these concepts to defendant's conduct, defendant discussed masturbation (in terms of "jack[ing] up" or, at the very least, talking about his penis being "excited") with an individual he knew was under 18 years old. A rational trier of fact could find that the discussion of masturbation in the context of "phone sex" by a 30-year-old adult with someone who previously told him she was between 12 and 15 years old constituted

irritating conduct "motivated by an unnatural or abnormal sexual interest" in the minor. (*In re Gladys R.* (1970) 1 Cal.3d 855, 867.)

### D. CONSTITUTIONALITY OF FELONY PROBATION CONDITIONS

Defendant claims that several of the felony probation conditions imposed by the trial court are unconstitutional because they lack an explicit knowledge requirement. A trial court has broad discretion to impose "reasonable conditions . . . [that] it may determine are fitting and proper to the end that justice may be done . . . ." (§ 1203.1, subd. (j).) That wide discretion is limited by the state and federal constitutions. Claims that a probation condition is unconstitutionally vague or overbroad can be raised even when, as here, defendant did not object in the trial court so long as the claim presents a pure question of law that can be resolved without reference to the sentencing record. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887-889 (*Sheena K.*).)

Vagueness challenges are based on "the due process concept of 'fair warning.' [Citation.]" (*Sheena K., supra,* 40 Cal.4th at p. 890.) A condition is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." (*Connally v. Gen. Const. Co.* (1926) 269 U.S. 385, 391.) Alternatively stated, the condition " 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated' . . . . [Citation.]" (*Sheena K.,* at p. 890.)

Unconstitutional overbreadth occurs when a probation condition "substantially limits a person's rights and those limitations are not closely tailored to the purpose of the condition." (*People v. Harrison* (2005) 134 Cal.App.4th 637, 641.) Thus, "[a] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*Sheena K., supra,* 40 Cal.4th at p. 890.)

When analyzing claims that probation conditions are unconstitutional, we are mindful that probation violations must be willful to justify revocation of probation. (*People v. Rodriguez* (2013) 222 Cal.App.4th 578, 594 (*Rodriguez*); *People v. Cervantes* (2009) 175 Cal.App.4th 291, 295 (*Cervantes*); *People v. Galvan* (2007) 155 Cal.App.4th 978, 982; § 1203.2, subd. (a).)  "A probation condition should be given 'the meaning that would appear to a reasonable, objective reader.' [Citation.]"  (*People v. Olguin* (2008) 45 Cal.4th 375, 382.)  Finally, if modification of a probation condition will cure a constitutional defect, we may modify the condition on appeal.  (*Sheena K., supra*, 40 Cal.4th at p. 892.)

### 1. Condition Prohibiting "Contact" with Doe

Condition number six as proposed in the probation report states: "The defendant shall have no contact with the victim(s)."  At the sentencing hearing, the court specified that defendant was "not to have any contact with the individual that we have referred to as A. Doe . . . ."  Defendant argues he could accidentally violate this condition if he found himself in the same public place as Doe.  We find it unlikely that a probation officer or a court would deem the passive conduct described by defendant a willful violation of the no contact condition.  (*Rodriguez, supra,* 222 Cal.App.4th at p. 594.)  However, in the interest of specificity we will modify this condition to read: "The defendant shall not initiate contact with the victim A. Doe."

### 2. Condition Requiring Defendant to Remain 100 Yards from Doe

Condition number 13 as proposed in the probation report states: "The defendant shall remain 100 yards from victim."  The court expressed the condition at the sentencing hearing as follows: "You are to remain 100 yards from the victim A. Doe."  Like the no contact condition, defendant argues this condition is defective because he could "inadvertently violate" it by accidentally running into Doe in public.

As this court stated recently, "[n]o reasonable law enforcement officer or judge can expect probationers to know where their victims are at all times."  (*Rodriguez, supra,*

222 Cal.App.4th 578, 594.)  Like the condition at issue in *Rodriguez*, defendant's condition "requires defendant to remove himself (['remain 100 yards from the victim']) when he knows or learns of a victim's presence."  (*Rodriguez*, at 594.)  That being said, in view of the mobile nature of victims, in contrast to a fixed location like a residence, the addition of an explicit knowledge requirement is warranted.  We therefore modify condition number 13 as follows:  "The defendant shall remain 100 yards from any location where he knows the victim A. Doe is present."

### 3.  Conditions Regarding Computer Usage

Condition number 16 as proposed in the probation report states: "The defendant shall not enter any social networking sites, nor post any ads, either electronic or written, unless approved by the probation officer."  As amended with a handwritten interlineation, condition number 18 states: "The defendant shall not access the Internet or any other on-line service through use of a computer, or other electronic device at any location (including place of employment) other than his home without prior approval of the probation officer.  The defendant shall not possess or use any data encryption technique program."  Finally, condition number 19, as imposed, states: "The defendant shall not clean or delete Internet browsing activity and must keep a minimum of four weeks of history."  The trial court's oral pronouncement of the conditions at the sentencing hearing did not materially depart from the recommendations in the probation report.  Defendant contends that by failing to include an explicit knowledge requirement, these conditions are unconstitutionally vague and overbroad because they could be violated by "inadvertently hitting the wrong keys on a computer" or "a wrong icon on an electronic device."

"A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad."  (*Sheena K.*, *supra,* 40 Cal.4th at p. 890.)  In his brief, defendant does not identify any constitutional right that is limited by the

probation conditions restricting computer use.  Even if defendant had identified a constitutional right and showed that the probation conditions "substantially limit[ed]" that right, (*Harrison, supra,* 134 Cal.App.4th at p. 641), we find that any limitation of his constitutional rights is closely tailored to the purpose of the conditions.  Defendant initially met Doe on the Myspace online social network.  By limiting defendant's access to the Internet, the conditions serve the purpose of keeping defendant "away from situations likely to lead to criminal conduct." (*Rodriguez, supra,* 222 Cal.App.4th at p. 590.)  Further, like the internet access condition another panel of this court approved in *People v. Pirali* (2013) 217 Cal.App.4th 1341, the conditions here do not amount to a "blanket prohibition" on Internet access because they "grant[] defendant the ability to access the Internet on his computer and other electronic devices so long as he obtains prior permission from his [probation] officer." (*Id.* at pp. 1349-1350.)

As for whether the conditions are vague, inadvertently hitting the wrong keys on a computer or accidentally tapping the wrong icon on an electronic device would not constitute willful conduct sufficient to revoke probation.  Instead, that inadvertent access is more akin to conduct outside the control of a defendant that other courts have deemed insufficient to constitute a willful probation violation, such as arriving 22 minutes late to a court hearing because of "last minute unforeseen circumstance[s]," (*People v. Zaring* (1992) 8 Cal.App.4th 362, 379), or failing to attend a court hearing due to detention by federal immigration authorities. (*Cervantes, supra,* 175 Cal.App.4th  at p. 295; see also *Galvan, supra,* 155 Cal.App.4th at pp. 983-984 [reversing trial court order revoking probation when defendant's failure to report to probation officer was due to his immediate deportation upon release from jail].)

We are nonetheless mindful that the Internet now pervades daily life and "that data encryption is ubiquitous in modern computer technology . . . ." (*People v. Friday* (2014) 225 Cal.App.4th 8, 43.)  Because the addition of explicit knowledge elements will protect defendant from truly inadvertent acts while still serving the purpose of ensuring that his

probation officer can track defendant's Internet activity as necessary, we will modify the conditions as follows: Condition number 16: "The defendant shall not knowingly enter any social networking sites, nor post any ads, either electronic or written, unless approved by the probation officer;" Condition number 18: "The defendant shall not knowingly access the Internet or any other on-line service through use of a computer, or other electronic device at any location (including place of employment) other than his home without prior approval of the probation officer.  The defendant shall not knowingly possess or use any data encryption technique program;" and Condition number 19: "The defendant shall not knowingly clean or delete Internet browsing activity and must keep a minimum of four weeks of history."

## E.  SECTION 654

Defendant contends that the trial court imposed concurrent sentences for the felony count and the misdemeanor count, which violated section 654 by punishing defendant's one act under more than one criminal provision.  The People respond that defendant's section 654 claim is unripe because the trial court suspended imposition of sentence when it placed defendant on felony probation.

The probation report recommended suspending imposition of sentence and granting formal probation for three years.  At the March 2012 sentencing hearing, the court stated that "the judgment of the [c]ourt then is that imposition of sentence is suspended and formal probation will be granted . . . ."  The court then ambiguously stated that "[a] county jail sentence is going to be imposed for a total of 848 days."  Later, the court indicated that "[t]he actual sentence the [c]ourt did impose, and if it didn't, will impose, [is] a total of 848 days.  That will be the sentence."  The sentencing minute order does not provide greater clarity.  The box next to the phrase "Imposition of sentence suspended for probation period" is checked but a sentence of 848 days (which is "Deemed Served") is listed as applicable to both the felony conviction and the misdemeanor conviction.  Importantly, however, neither the sentencing minute order nor

the court's statements at the sentencing hearing suggest an intention to deny probation on either count.

From the foregoing, we conclude that the trial court suspended imposition of sentence on both counts and that the county jail "sentence" referred to was intended to be a condition of probation.[5] Because the trial court suspended imposition of sentence on both counts, defendant's section 654 argument is unripe. (See *People v. Wittig* (1984) 158 Cal.App.3d 124, 137 [finding "no [§ 654] double punishment issue" when imposition of sentence was suspended].)

### III.    DISPOSITION

The judgment is modified to reflect the following probation conditions. Condition number 6 is modified to read: "The defendant shall not initiate contact with the victim A. Doe." Condition number 13 is modified to read: "The defendant shall remain 100 yards from any location where he knows the victim A. Doe is present." Condition number 16 is modified to read: "The defendant shall not knowingly enter any social networking sites, nor post any ads, either electronic or written, unless approved by the probation officer." Condition number 18 is modified to read: "The defendant shall not knowingly access the Internet or any other on-line service through use of a computer, or other electronic device at any location (including place of employment) other than his home without prior approval of the probation officer. The defendant shall not knowingly possess or use any data encryption technique program." Condition number 19 is modified to read: "The defendant shall not knowingly clean or delete

---

[5] Given the jail time imposed and custody credits awarded, we recognize that defendant appears to have no further custody exposure on the misdemeanor count. (§ 647.6, subd. (a)(1) [maximum penalty for conviction is 365 days].)

Internet browsing activity and must keep a minimum of four weeks of history."  As so modified, the judgment is affirmed.

_____
Grover, J.

**WE CONCUR:**

_____
Bamattre-Manoukian, Acting P.J.

_____
Márquez, J.