Filed 5/18/16  P. v. Villalobos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OMAR VILLALOBOS,<br><br>    Defendant and Appellant. | F069291<br><br>(Super. Ct. No. VCF227613)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Omar Villalobos, age 39, was prosecuted for behaving inappropriately toward an 11-year-old girl.  It was shown that he held the girl on his lap and caressed her thigh while watching a sexually themed movie.  Based on this conduct, a jury convicted him of

forcible commission of a lewd or lascivious act against a victim under the age of 14 years (Pen. Code,[1] § 288, subd. (b)(1)), exhibiting harmful matter to a minor with the intent to seduce (former § 288.2, subd. (a)), and misdemeanor child molestation (§ 647.6, subd. (a)).  He was sentenced to an aggregate term of eight years in prison.

Villalobos challenges the sufficiency of the evidence supporting his felony convictions, specifically with regard to the element of force required under section 288, subdivision (b), and the jury's finding that he exposed the victim to "harmful matter" within the meaning of section 288.2.  The latter claim relates to the content of the video that was playing during the acts of molestation.  He also alleges ineffective assistance of counsel based on his attorney's failure to request a statement of reasons for the trial court's imposition of consecutive sentencing pursuant to section 667, subdivision (c). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying incident occurred in Dinuba on July 22, 2009.  Villalobos was charged by information in July 2010 and tried before a jury in January 2014.  A significant portion of the prosecution's case-in-chief was devoted to establishing that members of the victim's family attempted to dissuade her from testifying against the defendant.  There was also testimony from a third party witness concerning prior uncharged offenses.  Our summary of the trial evidence is limited to information relevant to the specific issues raised on appeal.

Villalobos is described in the record as the victim's step-uncle, being that his brother is her stepfather.  On the night in question, Villalobos made a phone call to his brother's home that was answered by the victim.  He told her that he needed to come over to retrieve an item, and asked if anyone else was there.  She advised that her family

---

[1]All further statutory references are to the Penal Code.

members were home, but sleeping. Within minutes of hanging up with Villalobos, she heard him knocking at the front door.

After being let into the house, Villalobos briefly entered and exited the garage before sitting down on a couch in the living room. He then turned on the television and began flipping through channels. The victim came in and out of the room as he was channel surfing and eventually sat down on an adjacent couch. At some point, Villalobos rented what the victim described as a "porno" movie. She looked away from the screen while the movie was playing, but saw at least one scene in which a woman wearing only underwear was unzipping a man's pants. Villalobos asked if she had "ever watched anything like that before," and she told him no.

According to the victim's testimony, Villalobos began whispering things to her, which prompted her to move closer to him in order to hear what he was saying. Once in earshot, she realized he was asking if she had ever "done what the girl was doing in the video to someone." She again replied no, and returned to the other couch. He requested that she come back over and sit on his lap, and she complied.

While the child was seated on his lap, Villalobos put his arm around her waist and began rubbing her upper thigh with one of his hands. As he did this, he said that he "wanted to get close to [her] because [they] had never gotten close or talked." Next, he rubbed his penis over the top of his clothes and asked the victim if she "liked that." Feeling uncomfortable, the victim indicated that she did not like it and attempted to get off of his lap. In her words: "I tried getting up to leave and he pulled me back down." He held the victim on his lap for a few more minutes before she was able to move away from him. The victim retreated to her bedroom, and Villalobos departed from the home soon afterward.

The victim reported the incident to her family, who in turn called the police. Officer David Hernandez of the Dinuba Police Department arrived at the victim's house at approximately 12:24 a.m. on the morning of July 23, 2009. He testified to looking

3.

around the family's living room and observing an image on their television set. The screen indicated that a program called "Blonde Bimbos" had been paused at 22 minutes into the 88-minute feature. The officer's testimony was corroborated by Comcast billing records, which showed a $13.99 charge for a pay-per-view movie entitled "Blonde Bimbos" that was ordered on July 22, 2009 at 11:14 p.m.

Testifying in his own defense, Villalobos admitted to ordering and viewing "adult entertainment," but disputed the characterization of that material as pornography. He explained: "It wasn't like Barely Legal anything, no teens, it was Blond Bimbos … Entertainment like Playboy." On rebuttal, a police detective who questioned Villalobos about the incident testified that he had originally described the movie as being "X-rated."

The jury deliberated for a little over an hour before returning a verdict finding Villalobos guilty as charged on all counts. The trial court later imposed an eight-year prison sentence, comprised of a six-year term for committing a forcible lewd act on a child and a consecutive two-year term for exhibition of harmful matter with the intent to seduce, with credit for 615 days of presentence custody and conduct time. No time was imposed for the misdemeanor child molestation offense. Additional facts pertaining to the trial court's sentencing decisions are set forth in the Discussion, *post*.

## DISCUSSION

**Sufficiency of the Evidence**

Standard of Review

"In resolving claims involving the sufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) Each element of the offense must be supported by substantial evidence, i.e., evidence that reasonably inspires confidence and is of credible and solid value. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 89; *People v. Raley* (1992) 2 Cal.4th 870, 891.) "A

4.

reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  This standard of review applies in cases such as this one where the prosecution relies on circumstantial evidence to prove certain elements of the charged offenses.  (*Ibid.*)

Use of Force in Conjunction with a Lewd Act

Section 288, subdivision (a) criminalizes the commission of any lewd or lascivious act on a child under the age of 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of the perpetrator or the child.  Subdivision (b)(1) of the statute proscribes any such conduct committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury…."  The level of force contemplated by section 288, subdivision (b)(1) is an amount " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*People v. Soto* (2011) 51 Cal.4th 229, 242.)  "According to the majority of courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005; see *People v. Babcock* (1993) 14 Cal.App.4th 383, 387 [jurors may consider the victim's resistance in assessing whether defendant used force to accomplish the lewd act].)

Villalobos does not dispute that he used force to hold the victim on his lap against her will.  He argues instead that the application of force "occurred *after* the lewd act had been committed."  The problem with this argument is its presumption that caressing the victim's thigh was the only actionable conduct upon which the section 288, subdivision (b)(1) conviction could have been based.  Viewing the evidence in the light most favorable to the judgment, a reasonable trier of fact could have concluded that holding the child on his lap while watching an erotic video was itself a lewd or lascivious act.

"Section 288's defining characteristic is 'the defendant's intent to sexually exploit a child, not the nature of the offending act.' " (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1160.) "*Any* touching of a child under the age of 14 violates [the statute], even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim." (*People v. Lopez* (1998) 19 Cal.4th 282, 289, original italics.) For example, an ostensibly innocent embrace or similar display of "[p]hysical affection among relatives, generally considered acceptable conduct, nonetheless could satisfy the 'any touching' aspect of section 288 … if accompanied by the requisite lewd intent." (*Id*. at p. 291.)

These governing principles lead us to conclude there is substantial evidence to support the jury's verdict. A female sitting on a man's lap is in many contexts innocuous and unremarkable, but in some instances carries a sexual connotation. Villalobos's wrongful intent is readily inferable from the surrounding circumstances, and the contemporaneous act of forcing the victim to sit on his lap constitutes sufficient evidence from which the jury could have found the elements necessary to establish a violation of section 288, subdivision (b)(1).

Exhibition of Harmful Matter

Current and former versions of section 288.2 forbid knowingly exhibiting to a minor any type of "harmful matter" as that term is defined in Section 313. (Stats. 1997, ch. 590, § 1; Stats. 2013, ch. 777, § 2.) The law in effect at the time of the subject incident also required proof of the defendant's intent to seduce the minor, which case law has interpreted as the intent "to entice the minor to engage in a sexual act involving physical contact between the perpetrator and the minor." (*People v. Jensen* (2003) 114 Cal.App.4th 224, 240.) Villalobos claims the evidence adduced at trial was insufficient to establish the element of "harmful matter" and/or his intent to seduce the victim.

6.

"Harmful matter" is defined in section 313 as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." (§ 313, subd. (a).) In *People v. Dyke* (2009) 172 Cal.App.4th 1377 (*Dyke*), the First District observed that this statutory language tracks the definition of obscenity established in *Miller v. California* (1973) 413 U.S. 15, 24 (*Miller*), with two exceptions.[2] (*Dyke, supra*, 172 Cal.App.4th at pp. 1382-1383). The first difference is that section 313 requires the trier of fact to use a statewide standard as the relevant community standard by which the material is evaluated. (*Id*. at p. 1383.) The second distinction is that section 313 requires the trier of fact to determine whether the work lacks serious literary, artistic, political, or scientific value *for minors*, as opposed to considering how the material might otherwise be appreciated by the average adult. (*Ibid*.)

In *Dyke*, the defendant was found guilty of exhibiting harmful matter to a 16-year-old girl in violation of former section 288.2, subdivision (a) based upon "only a bare-bones recital by [the victim] of what she saw: a nude woman dancing and a naked couple having sex, shown from the waist up, and her own characterization of it as 'pornography.' " (*Dyke, supra*, 172 Cal.App.4th at p. 1385.) The appellate court reversed the conviction for insufficient evidence due to a lack of information regarding

---

[2] The *Miller* decision created a three-prong test to determine if material is obscene and thus subject to regulation by the states without offending the First Amendment to the United States Constitution. First, the trier of fact must decide if the average person applying contemporary community standards would conclude the material, taken as a whole, appeals to a prurient interest. Second, the trier of fact must determine whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law. Third, the trier of fact must determine whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. (*Miller, supra*, 413 U.S. at p. 24.)

the context in which nudity and sex had been portrayed in the subject material. (*Id*. at pp. 1385-1387.) The victim's labeling of the material as "pornography" was not probative of the issue because there had been "no testimony as to what she meant by that term, or how broadly it may have been intended." (*Id*. at p. 1384, fn. 5.)

The other leading case in this area is *People v. Powell* (2011) 194 Cal.App.4th 1268 (*Powell*). There, a 10-year-old victim not only characterized the movies shown to her as "pornographic," but described scenes containing "[p]enises, breasts, and vaginas featured in lewd displays as the actors 'did it,' i.e., engaged in sexual activity…." (*Id.* at pp. 1275, 1286, 1295.) Contrasting this evidence with the testimony found to be insufficient in *Dyke*, the Sixth District determined that it met "the minimum required for a rational trier of fact to conclude that defendant forced the victim to watch obscene depictions within the meaning of section 313, subdivision (a)." (*Powell,* at p. 1295.)

The evidence in this case, while hardly overwhelming, permits a reasonable inference that the movie shown to Villalobos's victim met the statutory definition of "harmful matter." In light of the scene described in the victim's testimony, the very title of the movie, "Blonde Bimbos," suggests content promoting the sexual objectification of women. The premium rate of $13.99 per viewing offers another clue with respect to substance and context, as does Villalobos's admission at trial that the images of a woman unzipping a man's pants occurred during the opening minutes of the video. These facts alone may not have risen to the level of substantial evidence, but the threshold was met by proof that Villalobos actually admitted the video was "X-rated," which is a term commonly understood to mean "relating to or characterized by explicit sexual material or activity." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 1149.)

On the witness stand, Villalobos denied ever telling police that he rented an X-rated movie and insisted the video was merely a form of "adult entertainment" akin to Playboy. He testified to his personal belief that adult entertainment is distinguishable from X-rated material because it can include movies that "don't show any privates." He

further explained that Playboy-esque films do not contain graphic sex scenes. The jury was free to accept Villalobos's testimony regarding his understanding of the difference between "adult entertainment" and X-rated videos, but reject his denials about previously admitting that the movie he rented fell into the latter category. Taken as a whole and viewed in the light most favorable to the judgment, the evidence is sufficient to support the jury's conclusions regarding the issue of "harmful matter."

Appellant's remaining arguments concerning the element of intent require little discussion. "Intent is rarely susceptible of direct proof and must usually be inferred from a consideration of all the facts and circumstances shown by the evidence." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 888.) Jurors could have easily inferred Villalobos's intent to seduce the victim, i.e., his intent to entice her into engaging in a sexual act involving physical contact, by the questions he asked her, such as whether she had ever "done what the girl was doing in the video to someone."

## Sentencing Issues

The trial court imposed consecutive mid-term sentences for Villalobos's convictions under former versions of section 288, subdivision (b)(1) and section 288.2, subdivision (a), resulting in a total prison term of eight years.[3] This sentence was authorized by section 667.6, subdivision (c), which provides for an alternative sentencing scheme in cases where the defendant is found guilty of certain types of sex crimes,

---

[3] The version of section 288.2 in effect at the time of Villalobos's offense made the crime of exhibiting harmful matter to a minor punishable by 16 months, two years, or three years in prison. (*People v. Simmons* (2012) 210 Cal.App.4th 778, 788; see Stats. 1997, ch. 590, § 1.) The current version of this statute follows the same felony sentencing scheme, but imposes heightened penalties where the harmful matter involves child pornography. (§ 288.2, subds. (a)(1), (2).) The version of section 288, subdivision (b)(1) in effect at the time of Villalobos's offense made the forcible commission of a lewd act upon a child punishable by 3, 6, or 8 years in prison. (Stats. 2010, ch. 219, § 7.) That code section has since been amended to impose longer periods of incarceration; the crime is now punishable by 5, 8, or 10 years in prison. (§ 288, subd. (b)(1).)

including any violation of section 288, subdivision (b). (§ 667.6, subds. (c), (e)(5).) "Specifically, section 667.6(c) 'allows the court in its discretion to sentence a defendant to full term consecutive sentences rather than the "one-third of the middle term" consecutive sentence formula set forth in section 1170.1, subdivision (a).' " (*People v. Sasser* (2015) 61 Cal.4th 1, 14.)

A trial court's imposition of consecutive prison terms pursuant to section 667.6, subdivision (c) must be accompanied by a statement of reasons. (*People v. Belmontes* (1983) 34 Cal.3d 335, 347-348.) Villalobos complains of the trial court's failure to provide the required explanation. However, respondent correctly notes Villalobos did not object to this omission at the time of sentencing, and the law is clear that forgoing such objections results in a forfeiture of the claim. (*People v. Scott* (2015) 61 Cal.4th 363, 406.) Mindful of these circumstances, Villalobos resorts to the common tactic of alleging ineffective assistance of counsel as a means of circumventing the forfeiture rule on direct appeal.

To establish a claim of ineffective assistance of counsel, an appellant must show "(1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) The test for prejudice is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) For the reasons that follow, we conclude Villalobos's arguments fall short of establishing prejudice. (See *id*. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice … that course should be followed."].)

At the sentencing hearing, defense counsel asked the trial court to impose a mitigated sentence that would entail no more than three years of prison time. The prosecution argued for an aggravated sentence of 11 years, i.e., consecutive upper terms

for the two felony convictions. The prosecution's argument was based in part on evidence of Villalobos's witness dissuasion efforts, which had allegedly caused the case to drag on for more than five years and exacerbated the impact of the crimes on the victim to the point where she moved out of her mother and stepfather's home to live with other relatives.

The trial court's statements preceding the imposition of sentence indicate that it was receptive to the victim impact argument: "It is a sad commentary that after all the paper flies, after all the comments are made, not even one person on behalf of this child wishes to be heard or writes on behalf of the trauma that she has had to endure due to no fault of her own whatsoever." The court cited the witness dissuasion evidence as a factor weighing against the selection of mitigated terms for appellant's convictions, but "decline[d] to characterize this case as an aggravated case" warranting the upper terms requested by the prosecution. The trial court ultimately imposed a sentence that mirrored the recommendation of the probation department.

The relevant conclusions set forth in the probation report, which specifically noted the court's discretionary authority to impose fully consecutive sentences pursuant to section 667.6, subdivision (c), were as follows: "The defendant has a lengthy prior record of criminal conduct, and he is currently pending sentencing in [an unrelated case]. Furthermore, his criminal activity appears to be increasing in seriousness. The defendant used his position of trust to commit the offense, making it egregious in nature, and deserving of a disciplinary response to protect the community, and deter others from criminal conduct by demonstrating its consequences. Therefore, it is respectfully recommended the defendant's application for probation be denied and he be committed to State Prison for the mid-term of six years in Count 1, to run fully and consecutively to a two-year term in Count 2 for a total term of eight years."

Villalobos's claim of prejudice rests upon several assumptions. He argues the trial court likely "misunderstood the scope of its discretion," i.e., was unaware it had the

11.

option to not impose fully consecutive prison terms. The basis for this argument lies in the prosecution's written statement in aggravation, which contained the erroneous contention that consecutive sentences were mandatory under section 667.6 subdivision (d).**4** Although the trial court rejected the prosecution's sentencing analysis and adopted the recommendations of the probation department, which had directed the court's attention to the applicable statutory authority (i.e., section 667.6, subdivision (c)), Villalobos believes the court was nevertheless misled by the prosecution's misstatement of the law, which purportedly explains why it did not provide a statement of reasons for its sentencing decision. From this premise he theorizes that an objection by his trial attorney would have alerted the trial court to its misapprehension of the law, and the court would have exercised its discretion to sentence him to a shorter period of incarceration.

A trial court is presumed to have understood and properly exercised its sentencing discretion. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) As Villalobos concedes in his briefing, the record must affirmatively demonstrate the trial court was unaware of its discretionary authority in order for us to accept his arguments. (See *People v. Fuhrman* (1997) 16 Cal.4th 930, 944-945.) Put differently, "remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229.) Although Villalobos's theories are plausible, the record does not affirmatively demonstrate the trial court's ignorance or confusion with regard to the scope of its sentencing discretion. Furthermore, "given that the sentence the court meted out coheres with the details of the probation report's recommendations, 'the natural inference is that it agreed with its findings.' " (*Powell*, *supra*, 194 Cal.App.4th at pp. 1298-1299.) Because the burden of showing prejudice has not been satisfied, the ineffective assistance of counsel claim fails.

_____

**4** Section 667.6, subdivision (d) provides: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions."

## **DISPOSITION**

The judgment is affirmed.

_____
GOMES, Acting P.J.

WE CONCUR:


_____
PEÑA, J.


_____
SMITH, J.

13.